1  SEYFARTH SHAW LLP
   Gerald L. Maatman, Jr. (SBN 06181016)
2  131 South Dearborn Street, Suite 2400
   Chicago, IL 60603
3  Telephone: (312) (312) 460-5000
   Facsimile: (312) 460-7000
4
   SEYFARTH SHAW LLP
5  Samuel T. McAdam (SBN 186084)
   Alfred L. Sanderson, Jr. (SBN 186071)
6  Anthony J. Musante (SBN 252097)
   400 Capitol Mall, Suite 2350
7  Sacramento, California 95814-4428
   Telephone: (916) 448-0159
8  Facsimile: (916) 558-4839

9  Attorneys for Defendant
   Spherion Atlantic Enterprises, LLC sued herein as
10 Spherion Pacific Workforce, LLC

11                 UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13

14 VALERIE D. WATSON-SMITH, AND ALL      )  Case No. C 07 05774 JSW
   OTHER SIMILARLY SITUATED,             )
15                                        )  **DEFENDANT SPHERION ATLANTIC
          Plaintiff,                      )  ENTERPRISES, LLC'S
16                                        )  MEMORANDUM OF POINTS AND
        v.                                )  AUTHORITIES IN OPPOSITION TO
                                          )  PLAINTIFF'S MOTION FOR LEAVE
17 SPHERION PACIFIC WORKFORCE, LLC,      )  TO FILE FIRST AMENDED
   and DOES 1 through 100, inclusive      )  COMPLAINT
18                                        )
          Defendant.                      )  Date:  October 3, 2008
19                                        )  Time:  9:00 a.m.
                                          )  Courtroom:  2
20 _____   )  Judge:  Honorable Jeffrey S. White

21

22      Defendant Spherion Atlantic Enterprises, LLC ("Defendant" or "Spherion") submits the

23 following memorandum of points and authorities in opposition to plaintiff's motion for leave to

24 amend her complaint.

25 I.   **INTRODUCTION**

26      Plaintiff seeks leave to amend her complaint to: (1) include a cause of action under Labor

27 Code section 2699 *et seq.*, also known as the California Labor Code Private Attorney General

28 Act ("PAGA"); and (2) modify the putative class definition to include two new subclasses.

DEFENDANT SPHERION ATLANTIC ENTERPRISES, LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

SC1 17005696 2

1  Defendant does not oppose plaintiff's proposed PAGA amendment, but does oppose plaintiff's

2  proposed amendment to modify the class definitions.

3       Plaintiff's Complaint includes three putative class definitions:

4            Class A

5            Persons paid on an hourly basis for whom Spherion records depict a meal period
             not taken who did not receive a compensation payment by Spherion for the lack
6            of said meal period.

7            Class B

8            Persons for whom work duties included employee supplied vehicular travel.

9            Class C

10           Persons paid on an hourly basis placed by Spherion with Cisco Systems as
             recruiters.
11

12      With her motion for leave to amend the Complaint, plaintiff proposes to amend the class

13  definition for Class A as follows:

14           Class A

15                Subclass 1

16                Persons paid on an hourly basis working on a customer site for
                  whom Spherion electronic time records depict a meal period not
17                taken, and who did not receive a compensation payment by
                  Spherion for the lack of a meal period in said pay period.
18
                  Subclass 2
19
                  Persons paid on an hourly basis working on a customer site
20                without the presence of a Spherion supervisor for whom Spherion
                  time records depict a meal period not taken, and who did not
21                receive a compensation payment by Spherion for the lack of a meal
                  period in said pay period.
22

23      The proposed subclasses are neither ascertainable nor viable and plaintiff's proposed

24  amendment therefore is futile.  Plaintiff's motion to amend the definition of Class A therefore

25  should be denied.

26

27

28                                    -2-
DEFENDANT SPHERION ATLANTIC ENTERPRISES, LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

SC1 17005606 2

## II.    ARGUMENT

Plaintiff seeks leave to amend her complaint to add two subclasses to the class definition under Class A. Because plaintiff's original Class A definition is flawed, any modification to it is an effort in futility. The original Class A and the proposed Subclasses 1 and 2, are not appropriate for class treatment under the standards set forth in the recent decision *Brinker v. Superior Court*, 2008 Cal.App. LEXIS 1138 (Cal. App. 4th Dist. July 22, 2008) (attached hereto as Appendix A), and are not ascertainable.

### A. Standard For Denying Leave To Amend.

Although leave to amend a complaint is "freely given," (*Foman v. Davis,* 371 U.S. 178, 182 (1962)), it nevertheless is within a court's discretion to deny it. *Id.* at 182. Leave to amend under Federal Rule of Civil Procedure 15 may be denied if the Court finds any of the following four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). While "prejudice to the opposing party . . . carries the greatest weight" among the factors, "a strong showing" on any one of the factors is enough to defeat a motion to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

A proposed amendment is futile if "no set of facts" can be proven under the amendment to constitute a valid claim or defense. *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). More specifically, if the proposed amendment defines a class that cannot be certified, the amendment is deemed futile. *See Paul v. Winco Foods, Inc.*, 2007 U.S. Dist. LEXIS 37024, *19-20 (D. Idaho Feb. 16, 2007) (where a class could not be certified, "allowing Plaintiffs' to submit their Second Amended Complaint would be futile, a valid reason for denial of the Motion for Leave to Amend Complaint under *Foman*."); *see also Luedke v. Delta Air Lines, Inc.*, 1993 U.S. Dist. LEXIS 11002, * 24 (S.D.N.Y. Aug. 6, 1993) ("[b]ecause the plaintiffs have failed to present this court with an objective, administratively feasible method for identifying the members of the proposed class and subclasses ... and because common questions do not

SCI 17005606 2

1  predominate over individualized inquiries, Plaintiffs' motion for leave to amend the class action

2  complaint is denied as futile.").

### B. Plaintiff's Motion To Amend The Class Definition Should Be Denied Because Proposed Class A And Subclass 1 And 2 Definitions Are Not Amenable To Class Treatment.

5  Federal Rule of Civil Procedure 23(b) requires that "questions of law or fact common to

6  the members of the class predominate over any questions affecting only individual members, and

7  that a class action is superior to other available methods for the fair and efficient adjudication of

8  the controversy." FED. R. CIV. PROC. 23(b)(3). To determine whether common questions

9  *predominate*, the Court must examine the substantive issues raised by the plaintiff, and the proof

10  relevant to each issue. *Jiminez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006).

11  If liability hinges on individual facts, or is subject to individualized defenses, then the class

12  should not be certified. *Id.* at 251-252; *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 249

13  (C.D. Cal. 2006) (certification denied where defendant had individualized defenses), *overruled*

14  *on other grounds in Sepulveda v. Wal-Mart*, 2008 U.S. App. LEXIS 9591 (9th Cir. 2008).

15  To determine whether common questions of law or fact predominate and class

16  certification is appropriate, a court "*must* examine the issues framed by the pleadings and the law

17  applicable to causes of action alleged." *Brinker v. Superior Court*, 2008 Cal. App. LEXIS 1138

18  (Cal. App. 4th Dist. July 22, 2008) at *29 (quoting *Hicks v. Kaufman and Broad Home Corp.*, 89

19  Cal.App.4th 908, 916 (2001).) Relying on *White v. Starbucks Corp.*, 497 F.Supp.2d 108 (N.D.

20  Cal. 2007) and *Brown v. Fed. Express Corp.*, 2008 U.S. Dist. LEXIS 17125 (C.D. Cal. 2008), the

21  court in *Brinker* determined that Labor Code section 226.7 and the Wage Orders do not require

22  employers to *ensure* that employees actually take meal breaks. *Brinker,* 2008 Cal. App. LEXIS

23  1138, at * 59. Instead, employers need only make meal periods *available* to employees. *Id.* at *

24  61. Because the reasons why employees may not have taken meal breaks that were made

25  available are many, the court found individualized issues predominated and denied class

26  certification. *Id.* at * 68.

27

28

-4-
DEFENDANT SPHERION ATLANTIC ENTERPRISES, LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

SCI 17005696 2

1    The court in *Brinker* rejected plaintiffs' evidence of purported missed meal breaks – time

2    cards indicating meal periods were not taken – without further evidence of *why* the meal breaks

3    were not taken:

> … the evidence does not show that Brinker had a class-wide policy that
> prohibited meal breaks. The evidence in this case indicated that some employees
> took meal breaks and others did not. For those who did not, the reasons they
> declined to take a meal period requires individualized adjudication. Further,
> plaintiffs' statistical and survey evidence does not render the meal break claims
> one in which common issues predominate. While time cards might show when
> meal breaks were taken and when there were not, they cannot show *why. Id.* at *
> 70-71 (emphasis in original).

9    Here, just as in *Brinker*, plaintiff does not rely on any alleged class-wide policy that

10    precluded Spherion employees from taking their meal periods.   In fact, just as in *Brinker*,

11    plaintiff is relying upon *records* depicting meal periods not recorded.  Even if such records

12    existed, as in *Brinker*, they would only tell one-half of the story.  They would not explain *why*

13    the meal period was not taken.  Therefore, plaintiff's original and proposed amended class

14    definitions are futile in that they fail to adequately state a viable putative class.[1]

### C. Plaintiff's Motion To Amend The Class Definition Should Be Denied Because The Proposed Class A And Subclass 1 And 2 Definitions Are Not Ascertainable.

17    Before a case may proceed as a class action, plaintiff must satisfy all four elements of

18    Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequate

19    representation. *General Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982); *Zinser v. Accufix*

20    *Research Institute*, 253 F.3d 1180, 1186 (9th Cir. 2001).  No class should be certified unless the

21    court is satisfied, after a "rigorous analysis," that the plaintiff has satisfied all of these

22    prerequisites. *General Tel. Co.*, 457 U.S. at 161. If the plaintiff fails to establish even one

---

[1] Plaintiff likely will argue that *Bufil v. Dollar Financial Group, Inc.*, 162 Cal.App.4th 1193 (2008) supports her proposed class and subclass definitions. *Bufil*, however, is distinguishable. In *Bufil*, Defendant had a policy in place that required employees who worked alone or with a trainee to not take meal or rest breaks. *Id.* at 1198. In other words, in *Bufil* the court could identify those employees who did not take a meal period by simply identifying those who worked alone or with a trainee. Here, as established in defendant's FRCP 30(b)(6) deposition, Spherion had no such policy and meal period practices may vary client by client. Deposition of Joan Orzo 42:25-43:17 ("Orzo Dep."). *Bufil*, therefore, is inapposite.

-5-

DEFENDANT SPHERION ATLANTIC ENTERPRISES, LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

SCI 17005606 2

1    prerequisite, the case cannot proceed as a class action. *See Rutledge v. Electric Hose & Rubber*

2    *Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

3        In addition to the requirements of Rule 23, courts also impose a requirement that the

4    parties seeking class certification present the court with an objective, "administratively feasible"

5    way of identifying class members. *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y. 1983)

6    (citing 7 C. Wright and A. Miller, *Federal Practice and Procedure* § 1760, at 581 (1972)). A

7    "basic requirement" of a class action under Rule 23 is that class membership must be "capable of

8    ascertainment under some objective standard." *Crosby v. Social Sec. Admin.,* 796 F.2d 576, 580

9    (1st Cir. 1986) (quoting 3B *Moore's Federal Practice* P 23.04[1], at 23-119). The need for a

10   definition that allows for the specific identification of class members is particularly important

11   because of class notice requirements. *Heffelfinger v. Elec. Data Sys. Corp.*, 2008 U.S. Dist.

12   LEXIS 5296, 28-29 (C.D. Cal. 2008).

13       Plaintiff's initial definition under Class A and her proposed Subclasses 1 and 2 fail to

14   adequately identify potential members of the class. Identifying Spherion employees "for whom

15   Spherion time records depict a meal period not taken, and who did not receive a compensation

16   payment by Spherion for the lack of a meal period in said pay period" would be a massive, time-

17   consuming undertaking rife with individual inquiries. Moreover, simply because an employee's

18   records indicate no meal period and no compensation payment does not mean there was a

19   violation of Labor Code sections 512, 226.7, or the Wage Orders. *See Brinker* discussion, *supra.*

20   Indeed, lack of a documented meal period could be the result of any number of factors,

21   including, *inter alia*, the following:

22       • The employee waived the meal period and decided to work through it;

23       • The employee took the meal period but inadvertently failed to record it;

24       • The employee took the meal period but did not affirmatively indicate that he or
         she took it on the time card;

25

26       • The employee took the meal periods but the data was entered into time sheets
         erroneously;

27       • The employee's meal period was taken pursuant to the client's policy, but the
         employee failed to indicate as much on his or her Spherion time sheet.

28
                                        -6-
DEFENDANT SPHERION ATLANTIC ENTERPRISES, LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

SCI 17005606 2

1 | None of the above would be a violation of Labor Code section 512, which requires employers to
2 | "provide" meal periods to employees.

3 |     Identifying those Spherion employees "for whom Spherion electronic time records depict
4 | a meal period not taken" would require Spherion to have implemented a system whereby it
5 | affirmatively recorded when employees were *prevented* from taking a meal period. Such a
6 | system is not required under the law and has not been implemented by Spherion. Although
7 | Spherion's records may indicate meal periods not documented, they do not necessarily indicate
8 | meal periods not *taken*. Therefore, the proposed subclass definitions are not viable.

9 |     The class definition of Subclasses 1 and 2 also are not ascertainable because they rely on
10 | a determination of the merits. Plaintiff has scripted the proposed subclass definitions in a
11 | manner which implies liability – employees who did not receive a meal break and were not paid
12 | the extra hour of pay for the missed meal break in accordance with Labor Code section 226.7.
13 | Even if the proposed subclass definitions were viable, which they are not, they are flawed
14 | because they rely on a determination of the merits to establish who is in the subclass. *See*
15 | MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.222 at 270 (2004) (class definition
16 | must be "precise, objective, and presently ascertainable"); *Simer v. Rios*, 661 F.2d 655, 659 (7th
17 | Cir. 1981) (refusing to certify class of persons "discouraged" from applying for governmental
18 | assistance). Plaintiff's proposed Class A and Subclass 1 and 2 are not defined in terms of
19 | objective characteristics and common transactional facts. Instead, given plaintiff's proposed
20 | class definitions, there will have to be an individualized determination on the merits to determine
21 | who belongs or does not belong in each subclass.

22 | **D. Plaintiff's Proposed Subclass Distinctions Are Non-Sensical.**

23 |     Plaintiff's Class A has been broken down into proposed Subclasses 1 and 2, which are
24 | distinguished by whether Spherion employees worked with or without Spherion supervision on
25 | site. Plaintiff apparently has broken down the subclasses as such on the premise that Spherion's
26 | clients schedule Spherion employees who work without Spherion supervision on site. Pltf. Mtn.,
27 | 3:12-4:3. This premise is flawed, primarily due to the fact that plaintiff has incorrectly cited, or

28 |

SCI 17005606 2

1　cited out of context, testimony from Defendant's FRCP 30(b)(6) witness Joan Orzo in support of

2　this subclass distinction.

3　　　　For example, plaintiff alleges, "Orzo testified that Spherion branch staff do not read

4　paper timesheets they process for payroll purposes to determine if records depict meal periods

5　taken by Spherion hourly employees." Pltf. Mtn., 3:17-19. Orzo *actually* testified that as

6　"[branch staff] are processing time sheets, if they notice an employee is not taking a lunch, we

7　would typically go back to the client and ask them why, to find out what took place there."

8　(Orzo Dep. 27:21-24.) More on point with her proposed subclass definitions, plaintiff argues

9　that Orzo testified that Spherion employees who work on customer sites without the presence of

10　Spherion supervisors have their meal periods scheduled by Spherion clients. Pltf. Mtn. 3:21-4:1.

11　Plaintiff, however, excludes Orzo's deposition testimony immediately following the citation

12　provided, where Orzo testified:

13　　　　　　Spherion adopts the work schedules to the client we work for. If in fact
14　　　　　　meal periods are not outlined in that work schedule, we would request that
　　　　　　one be included for our people. (Orzo Dep. 43:1-4.)

15　　　　Plaintiff also argues that "Orzo testified that in circumstances where a client does not

16　provide a meal period to a Spherion employee, Spherion does not pay the employee an additional

17　hour of compensation." Pltf. Mtn. 4:1-3. Orzo *actually* testified that she did not have any

18　information concerning a Spherion policy regarding paying for missed meal periods, and she had

19　never seen a pay statement providing pay for a missed meal period (Orzo Dep. 30:6-8).[2] Orzo

20　also testified that branch employees were aware that payments for missed meal periods were a

21　possibility if employees were not provided meal periods in accordance with California law.

22　(Orzo Dep. 28:21-29:5.)

23　　　　Finally, although plaintiff proposes two subclasses distinguished by whether employees

24　worked with or without Spherion supervision at client sites, plaintiff fails to explain why this

25　distinction matters.

---

26　[2] Plaintiff also alleges that Spherion's electronic time records do not indicate meal periods taken.
Pltf. Mtn. 5:20-21. While that may be true for time records used by plaintiff Watson-Smith, it is
27　not true for all Spherion California employees. *See* Declaration of Alfred L. Sanderson Jr. filed
and served herewith, Ex. B.
28　　　　　　　　　　　　　　　　-8-

DEFENDANT SPHERION ATLANTIC ENTERPRISES, LLC'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

SCI 17005606 2

III.   **CONCLUSION**

Defendant does not oppose plaintiff's motion to amend to state a cause of action under PAGA. However, because plaintiff's proposed subclass definitions are not amendable to class treatment or ascertainable, her motion for leave to amend to state Subclass 1 and Subclass 2 should be denied.

DATED: August 6, 2008                    SEYFARTH SHAW LLP


                                         By_____/s/ Alfred L. Sanderson
                                                  Samuel T. McAdam
                                                  Alfred L. Sanderson, Jr.
                                                  Anthony J. Musante
                                         Attorneys for Defendants
                                         SPHERION ATLANTIC ENTERPRISES
                                         LLC

SCI 17005606 2

# APPENDIX A

LEXSEE 2008 CAL.APP. LEXIS 1138

**BRINKER RESTAURANT CORPORATION et al., Petitioners, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; ADAM HOHNBAUM et al., Real Parties in Interest.**

**D049331**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE**

*2008 Cal. App. LEXIS 1138*

**July 22, 2008, Filed**

**PRIOR HISTORY:** [*1]
Superior Court of San Diego County, No. GIC834348, Patricia Yim Cowett, Judge.
*Brinker Restaurant v. S.C. (Hohnbaum), 2007 Cal. LEXIS 12247 (Cal., Oct. 31, 2007)*

**DISPOSITION:**    Petition granted.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

The trial court certified as a class action under *Code Civ. Proc., § 382,* a suit brought by restaurant employees alleging violations of laws governing rest and meal breaks. The employees alleged that while they were working in the employers' restaurants, they were denied rest periods, were denied meal periods, and were required to work off the clock during meal periods. The trial court, in certifying the case as a class action, did not reach the issue of what law applied to the employees' claims. Rather, the trial court expressly held that the applicable law did not have to be resolved as part of the certification process. (Superior Court of San Diego County, No. GIC834348, Patricia Yim Cowett, Judge.)

The Court of Appeal issued a peremptory writ of mandate directing the superior court to vacate its class certification order and to enter a new order denying with prejudice certification of the rest period, meal period, and off-the-clock subclasses. The court held that the trial court erred by failing to determine the threshold issue of the applicable law because such a determination was necessary to a finding of whether individual or common issues predominated in the case. The court further held that the claims were not amenable to class treatment because liability could only be established by making indi-

vidual inquiries. Whether employees were denied the rest and meal breaks to which they were entitled under *Lab. Code, §§ 226.7, subd. (a), 512, subd. (a),* and *Cal. Code Regs., tit. 8, § 11050, subds. 11(A), 12(A),* or voluntarily chose not to take them was a highly individualized inquiry, as was the question of whether any employees were forced to work off the clock. (Opinion by Nares, Acting P. J., with Haller and O'Rourke, JJ., concurring.)

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Parties § 6--Class Actions and Certification-- Prerequisites.**--*Code Civ. Proc., § 382,* authorizes class actions when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court. The party seeking class certification has the burden to establish (1) a sufficiently numerous, ascertainable class, (2) a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods. In turn, the community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. Whether certification of a class is appropriate is essentially a procedural question that does not ask whether an action is legally or factually meritorious. A trial court ruling on a certification motion determines whether the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.

**(2) Parties § 6.3--Class Certification--Common Questions--Determining Applicable Law--Wage and Hour Claims.**--A critical inquiry on a class certification motion is whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. In order to determine whether common questions of law or fact predominate, the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged. More specifically, in a wage and hour case, the court is required to determine the elements of the claims. A trial court cannot reach an informed decision on predominance and manageability without first determining the applicable law or delving into manageability issues.

**(3) Parties § 6.3--Class Certification--Common Questions--Determining Applicable Law--Wage and Hour Claims.**--The trial court, in certifying a class action, did not reach the issue of what law applied to restaurant employees' claims of violations of laws governing rest and meal breaks. Rather, the trial court expressly held that the applicable law need not be resolved as part of the certification process. The trial court erred in so finding because it could not determine whether individual or common issues predominated in the case, and thus whether a class action was proper, without first determining this threshold issue. Further, had the trial court correctly decided the elements of the employees' rest, meal break, and off-the-clock claims, it could have only concluded liability could only be established by making individual inquiry into each plaintiff's claims, and they thus were not amenable to class treatment.

[*Cabraser, California Class Action Practice and Procedure (2007), ch. 3, § 3.02; Cal. Forms of Pleading and Practice (2008), ch. 120, Class Actions, § 120.12; 3 Kiesel et al., Matthew Bender Practice Guide: Cal. Pretrial Civil Procedure (2008) § 33.04.*]

**(4)    Statutes    §    29--Construction--Language--Legislative Intent--Effectuating Intent.**--The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent. The court first examines the words themselves because the statutory language is generally the most reliable indicator of legislative intent. The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.

**(5) Labor § 7--Regulation of Working Conditions--Hours--Rest Period.**--The phrase "per four (4) hours or major fraction thereof" in *Cal. Code Regs., tit. 8, § 11050, subd. 12(A),* does not mean that a rest period

must be given every three and one-half hours. *Section 11050, subd. 12(A),* states that calculation of the appropriate number of rest breaks must be based on the total hours worked daily. Thus, for example, if one has a work period of seven hours, the employee is entitled to a rest period after four hours of work because he or she has worked a full four hours, not a major fraction thereof. It is only when an employee is scheduled for a shift that is more than three and one-half hours, but less than four hours, that he or she is entitled to a rest break before the four hour mark. Moreover, because the sentence following the "four (4) hours or major fraction thereof" limits required rest breaks to employees who work at least three and one-half hours in one work day, the term "major fraction thereof" can only be interpreted as meaning the time period between three and one-half hours and four hours. Apparently this portion of the wage order was intended to prevent employers from avoiding rest breaks by scheduling work periods slightly less that four hours, but at the same time made three and one-half hours the cut-off period for work periods below which no rest period need be provided.

**(6)    Statutes    §    22--Construction--Reasonableness--Avoiding Absurd Results.**--A court will not interpret a regulation in a manner that renders an entire sentence meaningless, and in a manner that leads to absurd results.

**(7) Labor § 7--Regulation of Working Conditions--Hours--Rest Period.**--The provisions of *Cal. Code Regs., tit. 8, § 11050, subd. 12(A),* do not require employers to authorize and permit a first rest break before the first scheduled meal period. Rather, the applicable language of *§ 11050, subd. 12(A),* states only that rest breaks insofar as practicable shall be in the middle of each work period. *Section 11050, subd. 12(A),* is silent on the question of whether an employer must permit an hourly employee to take a 10-minute rest break before the first meal period is provided. Moreover, the language of *§ 11050, subd. 12(A),* is clearly intended to provide employers with some discretion to not have rest periods in the middle of a work period if, because of the nature of the work or the circumstances of a particular employee, it is not practicable. This discretion is of particular importance for jobs, such as in the restaurant industry, that require flexibility in scheduling breaks because the middle of a work period is often during a mealtime rush, when an employee might not want to take a rest break in order to maximize tips and provide optimum service to restaurant patrons. As long as employers make rest breaks available to employees, and strive, where practicable, to schedule them in the middle of the first four-hour work period, employers are in compliance with that portion of *§ 11050, subd. 12(A).*

**(8)** *Labor § 7*--Regulation of Working Conditions--Hours--Meal Period.--*Lab. Code, § 512, subd. (a)*, plainly provides that an employer in California has a statutory duty to make a first 30-minute meal period available to an hourly employee who is permitted to work more than five hours per day, unless (1) the employee is permitted to work a total work period per day that is six hours or less, and (2) both the employee and the employer agree by mutual consent to waive the meal period.

**(9)** *Labor § 7*--Regulation of Working Conditions--Hours--Meal Period--Rulemaking.--*Lab. Code, § 516*, as amended, does not authorize the California Industrial Welfare Commission to enact wage orders inconsistent with the language of *Lab. Code, § 512.*

**(10)** *Labor § 7*--Regulation of Working Conditions--Hours--Meal Period.--*Lab. Code, § 512, subd. (a)*, plainly provides that an employer in California has a statutory duty to make a second 30-minute meal period available to an hourly employee who has a work period of more than 10 hours per day unless (1) the total hours the employee is permitted to work per day is 12 hours or less, (2) both the employee and the employer agree by mutual consent to waive the second meal period, and (3) the first meal period was not waived.

**(11)** **Statutes § 22--Construction--Reasonableness--Avoiding Surplusage.**--The courts presume that every word, phrase, and provision of a statute was intended to have some meaning and perform some useful function. Interpretations that lead to absurd results or render words surplusage are to be avoided.

**(12)** **Statutes § 42--Construction--Aids--Dictionaries.**--To ascertain the common meaning of a word, a court typically looks to dictionaries.

**(13)** *Labor § 7*--Regulation of Working Conditions--Hours--Meal Period.--From the plain language of *Lab. Code, § 512, subd. (a)*, meal periods need only be made available, not ensured.

**(14)** **Parties § 6.3--Class Certification--Common Questions--Affirmative Defense.**--A defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that issues presented by that defense predominate over common issues. Further, it matters not that the defendant bears the burden of proof on an affirmative defense. The question before the court is not whether the defendant proved its defense, but whether it presented evidence from which the trial court could reasonably conclude that the adjudication of the defense

would turn more on individualized questions than on common questions.

**(15)** *Labor § 7*--Regulation of Working Conditions--Hours--Off-clock Claims.--Employers can only be held liable for off-the-clock claims if the employer knows or should have known the employee was working off the clock.

**COUNSEL:** Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Johanna R. Shargel; Morrison & Foerster and Karen J. Kubin for Petitioner.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Julie A. Dunne and Guylyn R. Cummins for California Restaurant Association, Employers Group, California Hospital Association, California Retailers Association, National Council of Chain Restaurants and National Retail Federation as Amici Curiae on behalf of Petitioner.

William B. Sailer for California Employment Law Council as Amicus Curiae on behalf of Petitioner.

Greenberg Traurig, Gregory F. Hurley and Stacey Herter for National Association of Theatre Owners of California/Nevada, Inc., as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Lorens & Associates, L. Tracee Lorens, Robert D. Wilson III, Wayne A. Hughes; Cohelan & Khoury, Timothy D. Cohelan, Michael D. Singer, Christopher A. Olsen; The Turley Law Firm, William Turley; Furth, Lehmann & Grant, The Furth Firm, Frederick P. Furth, Jessica L. Grant; Schubert & Reed, Schubert Jonckheer Kolbe & Kralowec, Robert C. Schubert and Kimberly A. [*2] Kralowec for Real Parties in Interest.

Weinberg, Roger & Rosenfeld, David A. Rosenfeld, William A. Sokol, Theodore Franklin, Patricia M. Gates; and Miles E. Locker for Alameda County Central Labor Council, Contra Costa County Central Labor Council, Northern California Carpenters Regional Council, SEIU United Healthcare Workers-West and South Bay Central Labor Council as Amici Curiae on behalf of Real Parties in Interest.

Cynthia L. Rice and Jennifer Ambacher for California Rural Legal Assistance Foundation as Amicus Curiae on behalf of Real Parties in Interest.

**JUDGES:** Opinion by Nares, Acting P. J., with Haller and O'Rourke, JJ., concurring.

**OPINION BY:** Nares

**OPINION**

NARES, ACTING P. J.--Petition for writ of mandate after the superior court issued an order certifying a class.

In this action involving alleged violations of laws governing rest and meal breaks, we are presented with the following question: Did the trial court err in certifying this matter as a class action without first determining the elements of plaintiffs and real parties in interest Adam Hohnbaum, Illya Haase, Romeo Osorio, Amanda June Rader and Santana Alvarado's (collectively plaintiffs) claims against defendants Brinker Restaurant Corporation, [*3] Brinker International, Inc., and Brinker International Payroll Company, LP (collectively Brinker)?

Reconsidering the matter following a transfer from the California Supreme Court and our vacating of the original opinion in this matter, we first recognize that "in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed ... ." (*Industrial Welfare Com. v. Superior Court (1980) 27 Cal.3d 690, 702 [166 Cal. Rptr. 331, 613 P.2d 579].*) [1] We also recognize mandatory rest and meal breaks "have long been viewed as part of the remedial worker protection framework" designed to protect workers' health and safety. (*Murphy v. Kenneth Cole Productions, Inc. (2007) 40 Cal.4th 1094, 1105, 1113 [56 Cal. Rptr. 3d 880, 155 P.3d 284]* (*Murphy*).) In addition, we note that in construing the applicable statutes and regulations, we look to the plain language of the laws and interpret them in a manner consistent with the Legislature's intent. (*Fitch v. Select Products Co. (2005) 36 Cal.4th 812, 818 [31 Cal. Rptr. 3d 591, 115 P.3d 1233].*)

> 1  This matter is before us for a second time after the California Supreme Court, upon our request, granted review and [*4] then transferred the matter back to us with directions that we "vacate [the] opinion and reconsider the matter as [we] see[] fit." (Order, Oct. 31, 2007, S157479.)

With these principles in mind, we conclude the class certification order is erroneous and must be vacated because the court failed to properly consider the elements of plaintiffs' claims in determining if they were susceptible to class treatment. Specifically, we conclude that (1) while employers cannot impede, discourage or dissuade employees from taking rest periods, they need only provide, not ensure, rest periods are taken; (2) employers

need only authorize and permit rest periods every four hours or major fraction thereof and they need not, where impracticable, be in the middle of each work period; (3) employers are not required to provide a meal period for every five consecutive hours worked; (4) while employers cannot impede, discourage or dissuade employees from taking meal periods, they need only provide them and not ensure they are taken; and (5) while employers cannot coerce, require or compel employees to work off the clock, they can only be held liable for employees working off the clock if they knew or should [*5] have known they were doing so. We further conclude that because the rest and meal breaks need only be "made available" and not "ensured," individual issues predominate and, based upon the evidence presented to the trial court, they are not amenable to class treatment. Finally, we conclude the off-the-clock claims are also not amenable to class treatment as individual issues predominate on the issue of whether Brinker forced employees to work off the clock, whether Brinker changed time records, and whether Brinker knew or should have known employees were working off the clock. Accordingly, we grant the petition and order the superior court to vacate its order granting class certification and enter a new order denying certification of plaintiffs' proposed class.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Brinker and Its Written Policies*

Brinker operates 137 restaurants in California, including Chili's Grill & Bar, Romano's Macaroni Grill, and Maggiano's Little Italy. Brinker previously owned the Cozymel's and Corner Bakery Café chains, but sold the former in late 2003 and the latter in early 2006.

1. *Rest break and meal period policy*

Brinker's written policy, titled "Break and Meal Period Policy [*6] for Employees in the State of California," provides with regard to meal breaks, in a form to be signed by the employee, "I am entitled to a 30-minute meal period when I work a shift that is over five hours." The form also provides, as to rest breaks, "If I work over 3.5 hours during my shift, I understand that I am eligible for one [10-]minute rest break for each four hours that I work." The policy also provides that an employee's failure to follow the foregoing policies "may result in disciplinary action up to and including termination."

2. *Working off the clock policy*

With respect to the issue of working off the clock, Brinker's "Hourly Employee Handbook" states in part: "It is your responsibility to clock in and clock out for every shift you work. ... [Y]ou may not begin working until you have clocked in. Working 'off the clock' for any

reason is considered a violation of Company policy." Brinker's handbook also states, "If you forget to clock in or out, or if you believe your time records are not recorded accurately, you must notify a Manager immediately, so the time can be accurately recorded for payroll purposes."

## B. *2002 Settlement of Regulatory Action Against Brinker Restaurant* [*7] *Corporation*

California's Division of Labor Standards Enforcement (the DLSE) [2] investigated Brinker Restaurant Corporation's compensation practices from October 1, 1999 to December 31, 2001, regarding its hourly restaurant employees in California. Among other things, the DLSE investigated Brinker's alleged failure to (1) provide unpaid meal periods as required by law, and, starting on October 1, 2000, pay premium wages to employees who were not provided with meal periods as required under *Labor Code* [3] *section 226.7* and a specified Industrial Welfare Commission (IWC) [4] wage order; and (2) provide paid 10-minute rest breaks as required by law, and, starting on October 1, 2000, pay premium wages to employees who were not provided with such rest breaks as required under *section 226.7* and the specified IWC wage order.

> 2  "The DLSE 'is the state agency empowered to enforce California's labor laws, including IWC wage orders.' [Citation.]" (*Morillion v. Royal Packing Co.* (2000) 22 *Cal.4th 575, 581 [94 Cal. Rptr. 2d 3, 995 P.2d 139]*.)
>
> 3  All further statutory references are to the Labor Code unless otherwise specified.
>
> 4  The IWC is the state agency in the Department of Industrial Relations " 'empowered to formulate regulations (known [*8] as wage orders) governing employment in the State of California.' " (*Morillion v. Royal Packing Co., supra*, 22 *Cal.4th at p. 581*.) "It is the continuing duty of the [IWC] ... to ascertain the wages paid to all employees in this state, to ascertain the hours and conditions of labor and employment in the various occupations, trades, and industries in which employees are employed in this state, and to investigate the health, safety, and welfare of those employees." (*§ 1173*.) The IWC is comprised of five members appointed by the Governor. (*§ 70*.) "Although the IWC was defunded by the Legislature effective July 1, 2004, its wage orders remain in effect. [Citation.]" (*Bearden v. U.S. Borax, Inc.* (2006) *138 Cal.App.4th 429, 434, fn. 2 [41 Cal. Rptr. 3d 482]* (*Bearden*).)

In 2002 the DLSE filed suit against Brinker in the Los Angeles County Superior Court (the DLSE lawsuit).

[5] Before the DLSE completed its investigation and thus before it reached any final conclusions as to liability and damages, Brinker Restaurant Corporation and the DLSE entered into a settlement and release agreement (the DLSE settlement) under which Brinker Restaurant Corporation (1) paid $ 10 million to settle the DLSE lawsuit, and (2) agreed [*9] to a court-ordered injunction to ensure its compliance with California meal period and rest break laws until September 2006.

> 5  *Division of Labor Standards Enforcement v. Brinker Restaurant Corp.* (Super. Ct. Los Angeles County, 2002, No. BC279138).

## C. *Plaintiffs' Complaint*

Plaintiffs' first amended complaint (hereafter the complaint) alleges three types of wage and hour violations that are pertinent to the issues raised in this petition:

### 1. *Alleged rest break violations*

In their first cause of action, plaintiffs allege Brinker willfully violated *section 226.7* and IWC wage order Nos. 5-1998, 5-2000 and 5-2001 (hereafter collectively referred to as IWC Wage Order No. 5) by "fail[ing] to provide rest periods for every four hours or major fraction thereof worked per day to non-exempt employees, and failing to provide compensation for such unprovided rest periods." Plaintiffs also allege that as a result of these alleged unlawful acts, they and the members of the proposed class are entitled to recover premium wages and other relief under *sections 226, 226.7* and IWC Wage Order No. 5.

### 2. *Alleged meal period and "early lunching" violations*

In their second cause of action, plaintiffs allege Brinker [*10] violated *sections 226.7* and *512*, and IWC Wage Order No. 5, by failing to "provide meal periods for days on which non-exempt employees work(ed) in excess of five hours, or by failing to provide meal periods [altogether], or to provide second meal periods for days employees worked in excess of [10] hours, and failing to provide compensation for such unprovided or improperly provided meal periods." Plaintiffs claim that Brinker engages in unlawful "early lunching" by requiring its employees to take their meal periods soon after they arrive for their shifts, usually within the first hour, and then requiring them to work in excess of five hours, and sometimes more than nine hours straight, without an additional meal period. Plaintiffs also allege that as a result of these alleged unlawful acts, they and the members of the proposed class are entitled to recover premium wages and other relief under *sections 226* and *226.7*, and IWC Wage Order No. 5.

3. *Alleged off-the-clock/time shaving violations*

In their third claim, plaintiffs allege Brinker unlawfully required its employees to work off the clock during meal periods. Although this claim is not expressly set forth in the complaint, the court [*11] approved a stipulated amendment to the complaint under which (1) that pleading "include[s] allegations that employees worked 'off the clock' without setting forth those allegations with specificity"; and (2) plaintiffs' allegations with respect to off-the-clock work "shall be limited to: (a) time worked during a meal period when an individual was clocked out; and (b) time 'shaving,' which is defined as an unlawful alteration of an employee's time record to reduce the time logged so as to not accurately reflect time worked."

D. *Cross-motions on Plaintiffs' Rolling Five-hour Meal Period Claim*

In May 2005, pursuant to a court-approved stipulation to aid a mediation session, the parties submitted briefing to the court in the form of cross-motions on plaintiffs' rolling five-hour meal period claim. Specifically, the parties briefed the legal issue of "whether [Brinker] was required to provide a meal period for each five-hour block of time worked by an hourly employee." This statement of the issue followed the stipulation subheading: "When Must A Meal Period Be Provided?"

In their motion, plaintiffs asserted that "Brinker's policy of requiring their employees to work for periods of over [five] [*12] continuous hours without a meal break violates [IWC Wage Order No. 5], as well as [*sections*] *512* and *226.7*."

In its motion, Brinker argued it was only required to "provide a first meal period to its hourly, non-exempt employees when such employees worked more than five hours and that [it] was required to provide a second meal period to [those] employees only after [they] worked more than [10] hours in a workday."

Plaintiffs asserted in their written opposition to Brinker's motion that while rest breaks "need only be 'authorized and permitted,' ... *the employer must 'ensure' that the employee takes meal periods*." (Italics added.) Acknowledging that the 10-hour second meal period provision in *section 512* was not at issue in this case, plaintiffs also addressed their early lunching claim, asserting that Brinker's payroll records showed that Brinker was "forcing employees to take their meal period right after they report to work," and thus it was "impossible for [Brinker] to comply with the applicable wage orders as [it was] *not providing morning rest periods to [its] employees which precede the meal period*. Instead, they [were] *giving employees their meal periods as soon as they* arrive[d] [*13] *to work and then working them up*

to [10] *additional hours without an additional meal break*." (Italics added.) Plaintiffs asked the court to find that "by failing to provide second meal periods to employees required to work in excess of five hours before or after a meal," Brinker was violating IWC Wage Order No. 5, and plaintiffs and the members of the proposed class were entitled to compensation under *section 226.7*.

1. *July 2005 meal period "advisory opinion" and order*

On July 1, 2005, the court issued a written tentative advisory opinion on the issue of when an employer must provide a meal period to an hourly employee under *section 512*. The court found that, under that section, a meal period "must be given *before [an] employee's work period exceeds five hours*." (Italics added.) The court stated that "the DLSE wants employers to provide employees with break periods and meal periods toward the middle of an employee[']s work period in order to break up that employee's 'shift.' " Thereafter, on July 15 of that year, the court issued a minute order (hereafter the July 2005 order) stating the "advisory ruling" was "*confirmed by* the court *as an order*." (Italics added.)

E. *Brinker's First Writ* [*14] *Petition (Challenging the July 2005 Meal Period Order)*

In November 2005 Brinker filed its first petition for writ of mandate (D047509) in this matter. In the petition, Brinker challenged the court's July 2005 meal period order. Specifically, Brinker requested a writ directing the trial court to "vacate its earlier order holding that: (1) a non-exempt employee is entitled to a meal period for each five-hour block of time worked[; and] (2) the premium pay owed for a violation of [*section 226.7*] is a wage."

In support of its petition, Brinker argued the trial court erred by interpreting *section 512* to mean that an hourly employee's entitlement to a meal period is "rolling," such that "a separate meal period must be provided for each *five-hour block of time* worked ... regardless of the total hours worked in the day. In other words, the [court] interpreted the law to be that ... [o]nce a meal period concludes, the proverbial clock starts ticking again, and if the employee works five hours more, a second meal period must be provided."

Brinker also argued that although an employee working more than five hours and less than 10 hours is entitled under *section 512* to a 30-minute meal period [*15] at some point during the workday, "nothing in [s]ection 512 ... requires a second meal period be provided solely because [the] employee works five hours after the end of the first meal period, where the total time worked is less than [10] hours." Brinker further asserted that IWC Wage Order No. 5 also "does not dictate the

anomalous result that meal periods must be provided every five hours" because, like *section 512*, it requires only that an employee working more than five hours "gets a meal period *at some point* during the workday." Brinker complained that the court's meal period ruling "requires servers to sit down, unpaid, during the most lucrative part of their working day."

By order dated January 20, 2006, this court denied Brinker's first petition on the ground writ relief was not available to challenge an advisory opinion.

### F. *Plaintiffs' Motion for Class Certification*

In April 2006 plaintiffs moved to certify a class of "[a]ll present and former employees of [Brinker] who worked at a Brinker[-]owned restaurant in California, holding a non-exempt position, from and after August 16, 2000 ('Class Members')." In their moving papers, plaintiffs alternatively defined the class as "all [*16] hourly employees of restaurants owned by [Brinker] in California who have not been provided with meal and rest breaks in accordance with California law and who have not been compensated for those missed meal and rest breaks." In a footnote, plaintiffs stated that the compensation they had not received for the "missed meal and rest breaks" included " 'off-the-clock' work as [Brinker] engage[s] in several practices to avoid providing meal breaks known as, 'time shaving;' inserting meal periods into payroll records when they were not provided; and forcing employees to work 'off-the-clock' during meal breaks." The class in question is estimated to consist of more than 59,000 Brinker employees.

Plaintiffs' motion also sought certification of six subclasses, three of which are pertinent to this appeal: (1) a "Rest Period Subclass," consisting of "Class Members who worked one or more work periods in excess of three and a half (3.5) hours without receiving a paid 10 minute break during which the Class Member was relieved of all duties, from and after October 1, 2000"; (2) a "Meal Period Subclass," consisting of "Class Members who worked one or more work periods in excess of five (5) consecutive [*17] hours, without receiving a thirty (30) minute meal period during which the Class Member was relieved of all duties, from and after October 1, 2000"; and (3) an "Off-The-Clock Subclass," consisting of "Class Members who worked 'off-the-clock' or without pay from and after August 16, 2000."

Plaintiffs asserted that "[Brinker's] corporate policies of improper early meals, time shaving, failure to provide meal periods altogether or for less than [30] minutes, failure to provide rest periods, and forcing 'off-the-clock' work, are centralized and common to the class." They stated that "[u]tilization of the class action vehicle is the superior method of trying this case, due to the fact that

[Brinker] maintain[s] data and reports in 'searchable' format ... that specifically identify the number of employees who are not receiving meal breaks for every [five] hours worked, not receiving meal periods at all, and the instances where time cards have been manipulated, known at Brinker as 'time-shaving.' " Plaintiff further stated that "[t]his case [*18] can be easily tried as a class action with the use of statistical evidence to prove the effects of company-wide policies and practices on the Class Members."

In support of their contention that common issues predominated, plaintiffs submitted evidence that Brinker used a centralized computer system that could generate reports showing class-wide meal and rest break violations. Specifically, plaintiffs assert the computer records could be used to show all "employee shifts that lasted over five hours with breaks that were less than 30 minutes"; a "five hour short report" showing "employees that worked more than five hours in a day, but their time was changed to reflect less than five hours" to reveal "time shaving" done to conceal meal period violations; and run a "time card maintenance report" that identifies all changes made to original records. Plaintiffs also submitted detailed declarations from 33 current and former hourly employees. Some stated they were denied rest breaks but said nothing about whether they were denied meal breaks, or what time in their shift meal breaks were taken. Others stated they were not provided rest or meal breaks. Some of the declarants stated they were [*19] given meal breaks, but were required to take them within the first hour of working and were not given another meal break after working five hours. Some, but not all, stated they were required to work when they were clocked out for lunch or after their shift ended. Some stated they did not "waive" their breaks, but instead were not relieved of work duties so they could take their breaks.

Plaintiffs also submitted statistical and survey evidence that allegedly showed that even after its settlement with the DLSE, Brinker continued to prevent its employees from taking meal and rest periods. This evidence purported to show rest periods were not given, meal periods were not provided for every five hours worked, meal periods were taken for a period of less than 30 minutes, and second meal periods were not provided where employees worked more than five hours after the first meal period.

In its opposition, Brinker argued that a rest break class should not be certified because (1) under IWC Wage Order No. 5, paid rest breaks need only be permitted, not necessarily taken; (2) Brinker permitted its employees to take rest breaks; (3) whether individual employees took the rest breaks that Brinker [*20] provided

required a "hopelessly individualized" inquiry; and (4) individual issues thus predominated.

Brinker next argued that a meal period class should not be certified because (1) under *sections 512* and *226.7*, unpaid meal periods need only be provided, not necessarily taken; (2) plaintiffs' "rolling, five-hour approach to meal periods," which "would call for a second meal period for work days with *fewer than* 10 hours unless the first meal is taken exactly mid-shift" (original italics), was wrong because "[u]nder the plain language of *[s]ection 512*, an employee working more than five hours, but fewer than 10, is entitled to one 30-minute meal period at some point during the work day," and "*[s]ection 512* on its face calls for a second meal period only when more than 10 hours are worked"; (3) Brinker provided all required meal periods to its employees; (4) whether each employee was provided with meal periods as required by law "var[ied] person-by-person, shift-by-shift, and day-by-day," and "involve[d] hundreds of individualized inquiries"; and (5) individual issues thus predominated.

Brinker also argued that plaintiffs' off-the-clock claim should not be certified as a class action claim [*21] because (1) plaintiffs had not cited any Brinker policy to alter time records or permit off-the-clock work, and Brinker has a policy expressly prohibiting such work; (2) plaintiffs had no proof of "class-wide off-the-clock work"; (3) even if off-the-clock work occurred, Brinker could not be held liable unless it "suffered or permitted the work"; and (4) any off-the-clock work would have to be individually proven.

In support of its opposition to the class certification motion, Brinker submitted more than 600 declarations from hourly workers and almost 30 declarations from managers. Brinker submitted declarations from managers who stated they permitted their employees to take rest and meal breaks. The managers explained in detail their compliance with rest and meal break laws. They also explained that there was no uniform practice for meal breaks because it was different for servers, hosts and bartenders than for dishwashers and cooks, and it differed for lunch shifts versus dinner shifts. They explained that Brinker allowed restaurant managers to handle meal and rest breaks compliance locally, without a system-wide standard practice. For example, one manager explained lunch servers rarely [*22] worked shifts long enough to take lunch breaks, dishwashers and cooks at lunch would take lunch as a group, dinner servers had a "rolling" meal break policy, and dinner cooks and dishwashers took turns taking meal breaks. Every 15 minutes or so, one employee would clock out for a 30-minute meal break. Another manager stated that he came up with an Excel spreadsheet called a "Meal Compliance Log," which was attached as an exhibit to his declara-

tion. According to that manager, it was not used by other restaurants and easily allowed him to determine from time cards which employees were violating meal break policies and to give the employees written warnings about the violations. That manager also used a "Pasta Pal" system for meal and rest breaks, where opening shift servers and closing shift servers were paired up to assist each other in meal and rest breaks. Another manager stated that management at his restaurant had a written schedule to ensure meal breaks, which, at the request of employees, were often taken an hour after coming to work to ensure they could maximize their tips during peak business hours. They explained they allowed rest breaks and sometimes employees took more rest [*23] breaks than required by law. The manager declarations also explained how they would sometimes need to make changes in an employee's time card to accurately reflect hours worked because the employee would not clock out before beginning their meal period or would return from a meal period without clocking back in. Some restaurants had "meal compliance officers," whose entire shift was devoted to relieving other employees so they could take breaks. A manager of one of the named plaintiffs provided a declaration and supporting documentation challenging that plaintiff's claim he was not given rest and meal breaks and also stated he periodically gave that plaintiff and other employees free meals as a way of thanking them for their hard work.

Brinker submitted declarations from 283 employees who stated they were allowed rest breaks while employed by Brinker. With regard to meal breaks, 336 employees declared they were regularly provided 30-minute meal breaks. Brinker also submitted 433 statements obtained by the DLSE that indicated meal breaks were made available to Brinker employees.

In their reply brief, plaintiffs elaborated on their meal period, rest break, and off-the-clock claims.

With [*24] respect to their meal period claims, plaintiffs asserted in their reply papers that under the court's July 2005 order Brinker was required to provide its employees with a meal period for every five hours worked, and common issues predominated on plaintiffs' rolling five-hour meal period claim.

Plaintiffs maintained that common issues predominate on their claims for "missed or inadequate meal periods." Citing *Cicairos v. Summit Logistics, Inc. (2005) 133 Cal.App.4th 949, 962-963 [35 Cal. Rptr. 3d 243]* (*Cicairos*), plaintiffs asserted that employers have an affirmative duty to ensure employees receive meal periods, and the waiver provisions of *section 512* "cannot rationally be interpreted to mean the 'mutual consent' of employer and employee required to waive meal periods is relaxed to a *lesser* standard permitting employees to

'informally decline' (without obtaining the employer's consent)" because such an interpretation "flies in the face of the affirmative obligation placed upon the employer to relieve employees for meal periods enunciated in *Cicairos*."

Plaintiffs also stated that "[Brinker's claims that] it can meet its legal obligation to 'provide' meal periods by 'making them available,' and that employees [*25] may 'informally decline' them" was erroneous, because *Cicairos, supra, 133 Cal.App.4th 949* "confirm[s] that *meal periods may not be waived (or 'informally declined')*." (Italics added.)

Plaintiffs asserted that common issues predominate on their break claims because they "presented corporate policy evidence of a pattern and practice by Brinker of failing to provide a rest period prior to employees' meal period as a result of its practice of scheduling meals early." Specifically, plaintiffs argued that "Brinker maintains company-wide policies discouraging rest periods, including requiring servers to give up tables and tips if they want a break and failing to provide rest periods *prior* to scheduled early meals."

Last, claiming that common issues also predominate on their "off-the-clock" meal period claims, plaintiffs stated, "Plaintiffs' submissions ... provide evidence employees were asked to work while clocked out for meals." Noting they had limited their off-the-clock claims "to those relating to meal periods," plaintiffs also asserted that "Brinker's corporate records prove their 'time-shaving' claim. When entries are manipulated to delete time from an employee's shift to bring [*26] it under five hours, records reflect that change."

### G. Order Granting Class Certification

Following issuance of a tentative ruling on plaintiffs' class certification motion, and after a hearing thereon, the court took the matter under submission. On July 6, 2006, the court issued its order granting the motion and certifying the proposed class (class certification order), finding that "common issues predominate over individual issues." The court specifically found that "*common questions regarding the meal and rest period breaks* are sufficiently pervasive to permit adjudication in this one class action. [¶] [Brinker's] arguments regarding the necessity of making employees take meal and rest periods actually points to a *common legal issue of what [Brinker] must do to comply with the Labor Code*. Although a determination that [Brinker] need not *force employees to take breaks* may require some individualized discovery, the common alleged issues of meal and rest violations predominate." (Italics added.)

Brinker's writ petition followed.

### DISCUSSION

### I. *LAW GOVERNING CLASS CERTIFICATION MOTIONS*

The California Supreme Court has explained that "[t]he decision to certify a class rests squarely within the [*27] discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on *improper criteria*, or (3) it rests on *erroneous legal assumptions*. [Citations.]" (*Fireside Bank v. Superior Court (2007) 40 Cal.4th 1069, 1089 [56 Cal. Rptr. 3d 861, 155 P.3d 268] (Fireside Bank)*, italics added.) A class certification order "based upon *improper criteria or incorrect assumptions* calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.]" (*Linder v. Thrifty Oil Co. (2000) 23 Cal.4th 429, 436, 97 Cal. Rptr. 2d 179, 2 P.3d 27 (Linder)*, italics added.)

**(1)** The standards for class certification in California are well established. "*Code of Civil Procedure section 382* authorizes class actions 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them [*28] all before the court.' " (*Sav-On Drug Stores, Inc. v. Superior Court (2004) 34 Cal.4th 319, 326 [17 Cal. Rptr. 3d 906, 96 P.3d 194] (Sav-On)*.) The party seeking class certification has the burden to establish "(1) ... a sufficiently numerous, ascertainable class, (2) ... a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods." (*Fireside Bank, supra, 40 Cal.4th at p. 1089*; see *Sav-On, supra, 34 Cal.4th at p. 326*.) In turn, "the 'community of interest requirement embodies three factors: (1) *predominant common questions of law or fact*; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.]" (*Fireside Bank, supra, 40 Cal.4th at p. 1089*, italics added; see *Sav-On, supra, 34 Cal.4th at p. 326*.) Here, the parties to this writ proceeding contest only the first factor of predominance.

Whether certification of a class is appropriate is "essentially a procedural [question] that does not ask whether an action is legally or factually meritorious." (*Linder, supra, 23 Cal.4th at pp. 439-440*.) "A trial court [*29] ruling on a certification motion determines 'whether ... the issues which may be jointly tried, when

compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Sav-On, supra,* 34 Cal.4th at p. 326.)

(2) A critical inquiry on a class certification motion is whether "the *theory of recovery* advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On, supra,* 34 Cal.4th at p. 327, italics added.) In order to determine whether common questions of law or fact predominate, "the trial court *must* examine the issues framed by the pleadings and the law applicable to the causes of action alleged." (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 916 [107 Cal. Rptr. 2d 761] (*Hicks*), italics added, fn. omitted, citing *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 810-811 [94 Cal. Rptr. 796, 484 P.2d 964].)

## II. ANALYSIS

### A. Failure to Determine Elements of Plaintiffs' Claims

As we explained in part I., *ante,* in order to determine if common questions of fact predominated, the trial court was required to "examine the issues framed by the [*30] pleadings and the law applicable to the causes of action alleged." (*Hicks, supra,* 89 Cal.App.4th at p. 916, fn. omitted.) More specifically, in a wage and hour case such as this, the court was required to determine the elements of plaintiffs' claims.

For example, in *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906 [103 Cal. Rptr. 2d 320, 15 P.3d 1071], the trial court certified a nationwide class without first deciding what law applied to the class members' claims. The Court of Appeal denied the defendant's petition for writ of mandate, and the California Supreme Court reversed. In doing so the high court held "the decision in this case to order certification of a nationwide class was premised upon the faulty legal assumption that [the applicable law] need not be resolved as part of the certification process." (*Id.* at p. 927.) "[A] trial court cannot reach an informed decision on predominance and manageability" (*ibid.*) without first "determining the applicable law or delving into manageability issues." (*Id.* at p. 926.)

(3) Here, it is undisputed that the court did not reach the issue of what law applied to plaintiffs' claims. Rather, the court expressly held, as did the court in *Washington Mutual,* that the applicable [*31] law "need not be resolved as part of the certification process." (*Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 927.) The court erred in so finding because it could not determine whether individual or common issues pre-

dominate in this case, and thus whether a class action was proper, without first determining this threshold issue. Further, as we explain in greater detail, *post,* had the court correctly decided the elements of plaintiffs' rest, meal break and off-the-clock claims, it could have only concluded liability could only be established by making individual inquiry into each plaintiff's claims, and they thus are not amenable to class treatment.

### B. Rest Break Claims

*Section 226.7, subdivision (a)* provides: "No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the [*IWC*]." (Italics added.) For purposes of *section 226.7,* IWC wage order No. 5-2001, which became operative on January 1, 2001, and governs an employer's obligations with respect to rest breaks, is the current IWC wage order at issue in this writ proceeding. [6] The pertinent provisions of IWC wage order No. 5-2001 are codified in *California Code of Regulations, title 8, section 11050, subdivision 12(A)* [*32] (hereafter *Regulation 11050(12)(A)*), which provides: "Every employer shall authorize and permit all employees to take rest periods, which *insofar as practicable shall be in the middle of each work period.* The authorized rest period time shall be based on *the total hours worked daily* at the rate of ten (10) minutes net rest time *per four (4) hours or major fraction thereof.* However, a rest period need not be authorized for employees *whose total daily work time is less than three and one-half (3 1/2) hours.* Authorized rest period time shall be counted, as hours worked, for which there shall be no deduction from wages." (Italics added.)

> [6]  With exceptions not applicable here, IWC wage order No. 5-2001 applies to "all persons employed in the public housekeeping industry whether paid on a time, piece rate, commission, or other basis." (*Cal. Code Regs., tit. 8, § 11050, subd. 1.*) It defines "public housekeeping industry" to mean *"any industry, business, or establishment which provides meals,* housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the [IWC], *and includes,* but is not [*33] limited to the following: [¶] (1) *Restaurants,* night clubs, taverns, bars, cocktail lounges, lunch counters, cafeterias, boarding houses, clubs, *and all similar establishments where food in either solid or liquid form is prepared and served to be consumed on the premises."* (*Id., § 11050, subd. 2(P)(1),* italics added.)

**(4)** In order to properly interpret *Regulation 11050(12)(A)*, we apply the following principles of statutory interpretation: "The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent. [Citation.] 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.]" (*Fitch v. Select Products, Co., supra, 36 Cal.4th at p. 818.*) The interpretation of a statute presents a question of law subject to de novo appellate review. (*CBS Broadcasting Inc. v. Superior Court (2001) 91 Cal.App.4th 892, 906 [110 Cal. Rptr. 2d 889].*)

**(5)** The phrase "per four (4) hours or major fraction thereof" does [*34] not mean that a rest period must be given every three and one-half hours. *Regulation 11050(12)(A)* states that calculation of the appropriate number of rest breaks must "be based on the total hours worked daily." Thus, for example, if one has a work period of seven hours, the employee is entitled to a rest period after four hours of work because he or she has worked a full four hours, not a "major fraction thereof." It is only when an employee is scheduled for a shift that is more than three and one-half hours, but less than four hours, that he or she is entitled to a rest break before the four hour mark.

Moreover, because the sentence following the "four (4) hours or major fraction thereof" limits required rest breaks to employees who work at least three and one-half hours in one work day, the term "major fraction thereof" can only be interpreted as meaning the time period between three and one-half hours and four hours. Apparently this portion of the wage order was intended to prevent employers from avoiding rest breaks by scheduling work periods slightly less than four hours, but at the same time made three and one-half hours the cutoff period for work periods below which no rest [*35] period need be provided.

In supplemental briefing following transfer plaintiffs for the first time rely upon a February 16, 1999 DLSE opinion letter in support of their position that rest breaks must be provided every three and one-half hours. Specifically, that letter, responding to a query from an attorney in Camarillo, California, attempted to "clarify the meaning of 'or major fraction thereof' " in *Regulation 11050(12)(A)*. Jose Millan, the Chief Deputy Labor Commissioner, concluded that this phrase meant that "an employer must provide its employees with a 10-minute rest period when the employees work any time over the midpoint of each four hour block of time ... ." The DLSE elaborated, quoting a 1948 opinion from the chief of the

Division of Industrial Welfare (the predecessor to the DLSE) (1948 Chief's Decision): " 'Rest Periods--in the Orders shall be construed to mean that for each four hours (or majority fraction thereof) worked in a day the employee has earned the right to 10 minutes' rest time. That is, if the (employee) works more than 2 and up to 6 hours in a day, (the employee) is entitled to 10 minutes; if (the employee) works more than 6 and up to 10 hours in a day (the [*36] employee) is entitled to 20 minutes; if (the employee) works more than 10 and up to 14 hours in the day, (the employee) is entitled to 30 minutes, etc.' " (Feb. 16, 1999 DLSE Opn. Letter, quoting Chief's Decisions, Section 1101: Rest Periods, *General Interpretation and Enforcement Procedure of the Orders and the Labor Code Sections*, Manual of Procedure, Division of Industrial Welfare, Department of Industrial Relations (1948).)

**(6)** Thus, the DLSE interpreted the term "major fraction thereof" to mean any time over 50 percent of a four-hour work period. However, this interpretation is incorrect as it renders the current version of *Regulation 11050(12)(A)* internally inconsistent. An employee cannot, as the 1948 Chief's Decision says, be entitled to a 10-minute break if he or she "works more than 2 ... hours in a day," if the employee is not entitled to a 10-minute break if he or she works "less than three and one-half" hours in a day. We will not interpret *Regulation 11050(12)(A)* in a manner that renders an entire sentence meaningless, and in a manner that leads to absurd results. (*Reno v. Baird (1998) 18 Cal.4th 640, 658 [76 Cal. Rptr. 2d 499, 957 P.2d 1333]; City of Cotati v. Cashman (2002) 29 Cal.4th 69, 76-77 [124 Cal. Rptr. 2d 519, 52 P.3d 695].*) Further, [*37] we need not accept as precedent a DLSE letter that is contrary to law. (See *Murphy, supra, 40 Cal.4th at p. 1105, fn. 7.*)

There is a rational explanation why the 1948 Chief's Decision, upon which the February 16, 1999 DLSE opinion letter is based, interpreted the then existing version of *Regulation 11050(12)(A)* to provide a rest break every two hours. In 1948, the rest break regulation was found in [7] title 8 of the former California Administrative Code, section 11390 (Former Regulation 11390), and provided: "Every employer shall authorize all employees to take rest periods which, insofar as practicable, shall be in the middle of each work period. Rest periods shall be computed on the basis of 10 minutes for four hours working time, or *majority* fraction thereof. No wage deduction shall be made for such rest periods." (Italics added.)

    7    Effective January 1, 1988, the Legislature adopted a new designation for this code, i.e., the California Code of Regulations.

As can be seen from the text of former Regulation 11390, it did not contain the sentence providing "a rest

period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours." Thus, it would not make former Regulation [*38] 11390 internally inconsistent to interpret it to mean that for a work shift of more than two hours, a 10-minute rest break must be provided.

Moreover, former Regulation 11390 used the term "majority," while *Regulation 11050(12)(A)* uses the term "major." The term majority is defined as: "The greater number. The number greater than half of any total." (Black's Law Dict. (6th ed. 1990) p. 955, col. 1.) That definition comports with the IWC's interpretation of former Regulation 11390 to mean if an employee works "more than 2 and up to 6 hours in a day, (the employee) is entitled to 10 minutes" in rest break. However, when former Regulation 11390 was revised and renumbered as Regulation 11380 in 1952, at which time the sentence stating that no rest period need be given to workers who worked a daily work time of less than three and one-half hours was added, the term "majority" was changed to "major." (Cal. Code Regs., tit. 8, former § 11380, subd. (12).) It is readily apparent this change was made as use of the term "majority," and the interpretation given that term by the 1948 Chief's Decision, would conflict with the three and one-half hour cutoff for provision of rest periods.

Plaintiffs also cite a wage and [*39] hour treatise in support of its position. However, the cited portion of the treatise, Simmons, Wage and Hour Manual for California Employers (12th ed. 2007) at page 173, merely states that "the California Wage Orders require employers to 'authorize and permit' rest periods for nonexempt employees whose total daily work time is at least 3-1/2 hours." This phrase is consistent with an interpretation that rest breaks must be given if an employee works between three and one-half hour and four hours, but if four or more hours are worked, it need be given only every four hours, not every three and one-half hours.

In supplemental briefing, plaintiffs have expanded their argument and now contend that employees are entitled to a second rest period after working six hours, and a third rest period after working 10 hours. This contention is unavailing.

This argument ignores the plain text of *Regulation 11050(12)(A)*. If the IWC had intended that employers needed to provide a second rest period at the six-hour mark, and a third rest period at the 10-hour mark, it would have stated so in *Regulation 11050(12)(A)*.

(7) Furthermore, contrary to plaintiffs' assertion, the provisions of *Regulation 11050(12)(A)* [*40] do not require employers to authorize and permit a first rest break *before* the first scheduled meal period. Rather, the applicable language of *Regulation 11050(12)(A)* states

only that rest breaks "insofar as *practicable* shall be in the middle of each work period." (Italics added.) *Regulation 11050(12)(A)* is silent on the question of whether an employer must permit an hourly employee to take a 10-minute rest break before the first meal period is provided. As Brinker points out, an employee who takes a meal period one hour into an eight-hour shift could still take a post-meal period rest break "in the middle" of the first four-hour work period, in full compliance with the applicable provisions of IWC wage order No. 5-2001.

Moreover, the language of *Regulation 11050(12)(A)* is clearly intended to provide employers with some discretion to not have rest periods in the middle of a work period if, because of the nature of the work or the circumstances of a particular employee, it is not "practicable." This discretion is of particular importance for jobs, such as in the restaurant industry, that require flexibility in scheduling breaks because the middle of a work period is often during a mealtime [*41] rush, when an employee might not want to take a rest break in order to maximize tips and provide optimum service to restaurant patrons. As long as employers make rest breaks available to employees, and strive, where practicable, to schedule them in the middle of the first four-hour work period, employers are in compliance with that portion of *Regulation 11050(12)(A)*.

In support of their argument that employers must provide a rest period before the first meal period, plaintiffs cite a September 17, 2001 DLSE opinion letter. The 2001 DLSE opinion letter, which interpreted IWC wage order No. 16-2001, stated that "[i]f an employer *regularly requires employees to work five hours prior to their 30[-]minute lunch break*" (italics added), as a general matter under IWC wage order No. 16-2001 "the first rest period should come sometime before the meal break." (Sept. 17, 2001 DLSE Opn. Letter re: IWC Order 16-2001 Rest Period Provisions, p. 4.) However, that letter stated that its findings applied only to "persons employed in the on-site occupations of construction, drilling, logging, and mining" (*id.* at p. 1) and is thus inapplicable to this case. Moreover, plaintiffs do not contend that Brinker [*42] "regularly requires employees to work five hours prior to their 30[-]minute lunch break." On the contrary, plaintiffs complain that Brinker regularly engages in unlawful early lunching by requiring its employees to take their meal periods soon after they arrive for their shifts, usually within their first hour.

Brinker asserts the court failed to address the issue of whether employers must "force" employees to take rest breaks and, had it correctly ascertained that Brinker was not responsible for requiring its employees to take rest breaks, "it necessarily would have concluded that liability could only be established on an individual basis and that plaintiffs' claims were not amenable to class

treatment." In their return to the petition, plaintiffs respond they never disputed that rest breaks can be waived, and thus the court did not have to consider or decide that legal question.

Although plaintiffs acknowledge that employees can waive their right to take rest breaks that their employers authorize and permit as required by law, the court's class certification order is silent with respect to both the elements plaintiffs must prove to establish their rest break claims and the critical legal [*43] issue of whether employees may waive their right to take such breaks. In basing its predominance finding on the "common legal issue" of "what [Brinker] must do to comply with the Labor Code," the court assumed it was not required to determine the elements of plaintiffs' rest break claims before it certified the proposed class of Brinker's hourly employees. However, on the alleged facts of this purported class action, the court's assumption was incorrect, thus requiring reversal of the class certification order. (See *Linder, supra,* 23 Cal.4th at p. 436). Because the applicable provisions of *Regulation 11050(12)(A)* provide only that rest periods should be scheduled in the middle of each work period "insofar as practicable," the propriety of permitting a rest break near the end of a typical four-hour work period depends on whether the scheduling of such a rest break was practicable in a given instance, and thus cannot be litigated on a class basis.

Furthermore, because (as the parties acknowledge) Brinker's hourly employees may waive their rest breaks, and thus Brinker is not obligated to ensure that its employees take those breaks, any showing on a class basis that plaintiffs or other [*44] members of the proposed class missed rest breaks or took shortened rest breaks would not necessarily establish, without further individualized proof, that Brinker violated the provisions of *section 226.7, subdivision (a)* and *Regulation 11050(12)(A)* as plaintiffs allege in their complaint.

Had the court properly determined that (1) employees need be afforded only one 10-minute rest break every four hours "or major fraction thereof" (*Reg. 11050(12)(A)*), (2) rest breaks need be afforded in the middle of that four-hour period only when "practicable," and (3) employers are not required to ensure that employees take the rest breaks properly provided to them in accordance with the provisions of IWC Wage Order No. 5, only individual questions would have remained, and the court in the proper exercise of its legal discretion would have denied class certification with respect to plaintiffs' rest break claims because the trier of fact cannot determine on a class-wide basis whether members of the proposed class of Brinker employees missed rest breaks as a result of a supervisor's coercion or the employee's uncoerced choice to waive such breaks and continue working. Individual questions would also [*45]

predominate as to whether employees received a full 10-minute rest period, or whether the period was interrupted. The issue of whether rest periods are prohibited or voluntarily declined is by its nature an individual inquiry.

Plaintiffs assert that even if the court erred in failing to define the elements of plaintiffs' rest period claims prior to certifying the class we must remand this matter to allow the court to determine if their "expert statistical and survey evidence" makes their rest break claims amenable to class treatment. However, while it is clear that courts may use such evidence in determining if a claim is amenable to class treatment (see *Sav-On, supra,* 34 Cal.4th at p. 333), that evidence does not change the individualized inquiry in determining if Brinker allowed rest periods, or forbid employees from taking them. As summarized in the factual background, *ante,* in addition to being based upon faulty legal principles, that evidence only purported to show when rest breaks were taken, or not. It did not show *why* rest breaks were not taken. It could also not show *why* breaks of less than 10 uninterrupted minutes were taken. Plaintiffs claim they were forced to forgo rest [*46] breaks, while Brinker submitted evidence from management and employees that rest breaks were made available but on occasion waived by the employees. The question of whether employees were forced to forgo rest breaks or voluntarily chose not to take them is a highly individualized inquiry that would result in thousands of minitrials to determine as to each employee if a particular manager prohibited a full, timely break or if the employee waived it or voluntarily cut it short. (*Brown v. Federal Express Corp. (C.D.Cal. 2008) 249 F.R.D. 580, 587 (Brown)* [meal period violations claim not amenable to class treatment as court would be "mired in over 5000 mini-trials" to determine if such breaks were provided].) This individualized proof makes plaintiffs' rest break claims not amenable to class treatment.

Further, contrary to plaintiffs' suggestion in their supplemental briefing, our conclusion that individual issues predominate does not dictate that claims asserting violations of rest break laws can never be certified as a matter of law. Rather, we are only concluding that under the facts presented to the trial court in this case, and the manner in which plaintiffs' claims [*47] are defined, the claims in this case are not suitable for class treatment. Moreover, we are not, as plaintiffs claim, improperly determining the merits of their claims. (See *Lewis v. Robinson Ford Sales, Inc. (2007) 156 Cal.App.4th 359, 367 [67 Cal. Rptr. 3d 347]* ["[i]n determining class certification questions, the courts do not decide the merits of the case ..."].) Rather, as explained, *ante,* we are only determining the law applicable to their claims.

For all of the foregoing reasons, we conclude that the class certification order rests on improper criteria and incorrect assumptions with respect to the rest break claims, and thus the court abused its discretion in finding that those claims are amenable to class treatment. Accordingly, the portion of the class certification order certifying the rest break subclass must be vacated. (*Fireside Bank, supra,* 40 Cal.4th at p. 1089.)

*C. Meal Period Claims*

Plaintiffs also assert two principal claims regarding missed or inadequate meal periods. First, plaintiffs assert a rolling five-hour meal period claim, alleging Brinker's uniform meal period policy violates *sections 512* and *226.7,* and IWC Wage Order No. 5, by failing to provide or make available to Brinker's hourly employees [*48] a 30-minute uninterrupted meal period for every five *consecutive* hours of work. Related to this claim is plaintiffs' assertion that Brinker's "most egregious meal period violations" stem from its practice of early lunching, under which Brinker allegedly requires its hourly employees to take their meal periods soon after they arrive for their shifts, usually within the first hour, and then requires them to work in excess of five hours, and sometimes more than nine hours straight, without an additional meal period.

Second, plaintiffs claim that employers have an affirmative duty under IWC Wage Order No. 5 to ensure that hourly employees are relieved of all duty during meal periods, and Brinker's uniform meal period policy violates *sections 512* and *226.7,* and IWC Wage Order No. 5, by failing to ensure that its hourly employees "receive" or "take" their meal periods.

We conclude the court (1) abused its discretion in concluding that plaintiffs' rolling five-hour and early lunching meal period claims are amenable to class treatment because it was based upon incorrect legal assumptions and (2) incorrectly assumed that, in order to render an informed certification decision, it did not have [*49] to resolve the issue of whether Brinker had a duty to ensure that its employees take their meal periods. We further conclude that employers need only make meal breaks available, not "ensure" they are taken, and, for the same reasons expressed in our discussion regarding rest breaks, the meal break claims are not amenable to class treatment.

*1. Rolling five-hour meal period claim*

As discussed, *ante,* the court found, in what it initially termed an "advisory" opinion, a meal period "must be given *before [an] employee's work period exceeds five hours.*" (Italics added.) The court also stated that "the DLSE wants employers to provide employees with break

periods and *meal periods toward the middle of an employee['s] work period* in order to break up that employee's 'shift.' " (Italics added.) The court further stated that Brinker "appears to be in violation of *[section] 512* by not providing a 'meal period' *per every five hours of work.*" (Italics added.) Two weeks later, at an ex parte hearing, the court issued a minute order (the July 2005 order) stating the "advisory ruling" was "*confirmed by the court as an order.*" (Italics added.) [8]

> 8   This court's order denying Brinker's first writ petition [*50] stated in part: "The review of an advisory opinion would result in an advisory opinion. California courts generally have no power to render an advisory opinion. [Citation.] The petition is denied." Upon further review, that order was erroneous as the "advisory" opinion by the trial court was later confirmed by the court as an official order.

We conclude that the court's rolling five-hour meal period ruling in its July 2005 order was erroneous, and thus the class certification order rests on improper criteria with respect to plaintiffs' rolling five-hour meal period claim and cannot stand to the extent it was based on that ruling. (See *Fireside Bank, supra,* 40 Cal.4th at p. 1089.)

*Section 512, subdivision (a)* (hereafter *section 512(a)*), which governs an employer's obligations with respect to the "providing" of meal periods to its hourly employees, provides: "An employer may not employ an employee for a work period of more than five hours *per day* without *providing* the employee with a meal period of not less than 30 minutes, except that if the *total work period per day* of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and [*51] employee. An employer may not employ an employee for a work period of more than 10 hours *per day* without *providing* the employee with a second meal period of not less than 30 minutes, except that if the *total hours worked* is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." (Italics added.)

**(8)** *Section 512(a)* thus plainly provides that an employer in California has a statutory duty to make a first 30-minute meal period available to an hourly employee who is permitted to work more than five hours *per day,* unless (1) the employee is permitted to work a "total work period per day" that is six hours or less, and (2) both the employee and the employer agree by "mutual consent" to waive the meal period.

**(9)** This interpretation of *section 512(a),* regarding an employer's duty to provide a first meal period, is con-

sistent with the plain language set forth in IWC wage order No. 5-2001, which provides in part: "No employer shall employ any person for a *work period of more than five* (5) *hours* without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) [*52] hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee." (*Cal. Code Regs., tit. 8, § 11050, subd. 11(A)*). Although that subdivision of the wage order refers to "work period of more than five (5) hours" rather than to "work period of more than five (5) hours *per day*," the Legislature used the term "work period of more than five hours *per day*" (italics added) in *section 512(a)*, and we presume the Legislature intended the provisions of IWC wage order No. 5-2001 and *section 512(a)* to be given a consistent interpretation. "*[S]ection 516*, as amended in 2000, does not authorize the IWC to enact wage orders inconsistent with the language of *section 512*." (*Bearden, supra, 138 Cal.App.4th at p. 438*.)

With respect to the issue of *when* an employer must make a first 30-minute meal period available to an hourly employee, Brinker's uniform meal period policy (titled "Break and Meal Period Policy for Employees in the State of California") comports with the foregoing interpretation of *section 512(a)* and IWC wage order No. 5-2001. It provides that employees are "entitled to a 30-minute meal period" when they "work a shift that [*53] is over five hours."

(10) *Section 512(a)* also plainly provides that an employer in California has a statutory duty to make a second 30-minute meal period available to an hourly employee who has a "work period of more than 10 hours *per day*" (italics added) unless (1) the "total hours" the employee is permitted to work per day is 12 hours or less, (2) both the employee and the employer agree by "mutual consent" to waive the second meal period, and (3) the first meal period "was not waived."

Plaintiffs contend, and the trial court ruled in its July 2005 order, that Brinker's written meal policy violates *section 512(a)* and IWC Wage Order No. 5 (specifically, *Cal. Code Regs., tit. 8, § 11050, subd. 11(A)*) because it allows the practice of early lunching and fails to make a 30-minute meal period available to an hourly employee for every five consecutive hours of work. Plaintiffs contend that hourly employees are entitled to a second meal period five hours after they return to work from the first meal period.

Under this interpretation, however, the term "per day" in the first sentence of *section 512(a)* would be rendered surplusage, as would the phrase "[a]n employer may not employ an employee for [*54] a work period of more than 10 hours per day without providing the em-

ployee with a second meal period of not less than 30 minutes ..." in the second sentence of that subdivision.

(11) "It is a well established principle of statutory construction that '[t]he courts presume that every word, phrase, and provision of a statute was intended to have some meaning and perform some useful function ... .' [Citation.]" (*Twain Harte Homeowners Assn. v. County of Tuolumne (1982) 138 Cal.App.3d 664, 698-699 [188 Cal. Rptr. 233]*.) "Interpretations that lead to absurd results or render words surplusage are to be avoided. [Citation.]" (*Woods v. Young (1991) 53 Cal.3d 315, 323 [279 Cal. Rptr. 613, 807 P.2d 455]*.)

Here, the interpretation of *section 512(a)* given by plaintiffs and the court is erroneous as a matter of law, and thus must be avoided because it renders surplusage the provisions of that subdivision governing the question of when an employer must provide meal periods to an hourly employee. (See *Woods v. Young, supra, 53 Cal.3d at p. 323*.)

Citing *California Hotel & Motel Assn. v. Industrial Welfare Com. (1979) 25 Cal.3d 200 [157 Cal. Rptr. 840, 599 P.2d 31]*, the court stated in its order that "[t]he California Supreme Court has interpreted wage orders to require a meal period for each five-hour [*55] period an employee works," and "[a] meal period of [30] minutes per five hours of work is generally required." That case, however, is distinguishable as it involved an IWC wage order (No. 5-76) that is not involved in the present case. (*California Hotel & Motel Assn., supra, 25 Cal.3d at p. 205, fn. 7*.) As summarized by the Supreme Court, the pertinent provision of that wage order provided that "[a] meal period of 30 minutes per *5 hours of work* is generally required." (*Ibid.*, italics added.) As already discussed, however, *section 512(a)*, which governs here, provides in part: "An employer may not employ an employee for a *work period of more than five hours per day* without providing the employee with a meal period of not less than 30 minutes." (Italics added.) The distinction between the two provisions is of critical importance. Whereas IWC wage order No. 5-76 generally required a meal period for every "5 hours of work," *section 512(a)* generally requires a first meal period for every "work period of more than five hours *per day*." (Italics added.)

Moreover, *California Hotel & Motel Assn. v. Industrial Welfare Com., supra, 25 Cal.3d 200* was decided before *section 516* was amended in 2000, [*56] which amendment forbids wage orders inconsistent with *section 512*. (*Bearden, supra, 138 Cal.App.4th at p. 438* [*section 516* provides IWC orders "must be consistent with the specific provisions of [*section 512*]"].) Indeed, the legislative history of the 2000 amendment to *section 516* declares its intent was to "prohibit the [IWC] from adopting a working condition order that conflicts with [*section*

512(a)'s] 30-minute meal period requirements ... ."
(Legis. Counsel's Dig., Sen. Bill No. 88 (1999-2000 Reg.
Sess.) Stats. 2000, ch. 492.) The Senate third reading
analysis for Senate Bill No. 88, which amended *section
516* in 2000, states: "This bill clarifies two provisions of
the Labor Code enacted in Chapter 134. *Labor Code
Section 512* codifies the duty of an employer to provide
employees with meal periods. *Labor Code Section 516*
establishes the authority of IWC to adopt or amend
working condition orders with respect to break periods,
meal periods, and days of rest. *This bill provides that
IWC's authority to adopt or amend orders under Section
516 must be consistent with the specific provisions of
Labor Code Section 512.*" (Third reading analysis of Sen.
Bill No. 88 (1999-2000 Reg. Sess.) as amended June 29,
2000, p. 4, italics added.) Thus, to the extent IWC wage
order No. 5-76 is [*57] inconsistent with *section 512*, it
is invalid. (Bearden, *supra*, 138 Cal.App.4th at pp. 438-
444.)

In support of their claim that lunch breaks must be
provided in the middle of a shift, plaintiffs also rely upon
a June 14, 2002 DLSE opinion letter. However, that
opinion letter has since been withdrawn and therefore
cannot be relied upon to support plaintiffs' claims. (Act-
ing Deputy Chief Gregory L. Rupp, mem. to all DLSE
staff, Dec. 20, 2004.) Plaintiffs' reliance on the Septem-
ber 17, 2001 DLSE opinion letter is also misplaced as
that letter concerned the timing of rest periods, not meal
breaks. As discussed, *ante*, the wage order pertaining to
rest breaks provides that, to the extent practicable, rest
periods should be scheduled in the middle of a work pe-
riod. No such restriction on the timing of meal periods is
contained in the wage order concerning meal periods.

We conclude the court abused its discretion in certi-
fying the class in this matter to the extent it relied on an
erroneous interpretation of *section 512(a)*. As already
discussed, a class certification order based upon im-
proper criteria or incorrect assumptions must be re-
versed, even though there may be substantial evidence to
support [*58] it. (Linder, *supra*, 23 Cal.4th at p. 436.)
Here, the court's order certifying the meal period sub-
class class was based upon both improper criteria regard-
ing the elements of the rolling five-hour meal period
claim and an incorrect assumption about when an em-
ployer must provide a meal period under the provisions
of *section 512(a)*. Without a proper interpretation of *sec-
tion 512(a)*, the court could not correctly ascertain the
legal elements that members of the proposed class would
have to prove in order to establish their meal period
claims, and thus could not properly determine whether
common issues predominate over issues that affect indi-
vidual members of the class.

## 2. Brinker's alleged failure to ensure employees take meal periods

Plaintiffs also claim that Brinker's uniform meal pe-
riod policy violates *sections 512* and *226.7*, as well as
IWC Wage Order No. 5, by failing to *ensure* that its
hourly employees take their meal periods. [9] Plaintiffs
initially opposed this court deciding this issue, arguing
the trial court had already done so, and, even if it had
not, the issue should be remanded to the trial court to
decide it in the first instance. However, in supplemental
briefing following [*59] transfer from the California
Supreme Court, plaintiffs join Brinker in requesting that
we decide the legal question of whether employers must
"ensure" meal periods are taken or whether they must
only be made "available." In order to promote judicial
economy and because this is a purely legal issue that we
may decide in the first instance, we will address this is-
sue on the merits.

> [9]    Amici curiae Employers Group, California
> Restaurant Association, National Council of
> Chain Restaurants, National Retail Federation,
> California Hospital Association, and The Califor-
> nia Retailers Association frame the issue as fol-
> lows: "Whether California's Labor Code imposes
> on employers a duty to not only *provide* uninter-
> rupted meal periods, but to further *force* employ-
> ees to take their meal periods and to *police* their
> compliance--regardless of the reason proffered by
> the employee for not wanting a meal period and
> even against the employee's will." Amici curiae
> California Employment Law Council and Na-
> tional Association of Theatre Owners of Califor-
> nia/Nevada, Inc., raise a similar issue: "[W]hether
> employers must force their employees to take
> meal ... breaks or whether they must simply pro-
> vide the opportunity [*60] for such breaks."

We conclude that California law provides that
Brinker need only provide meal periods, and, as a result,
as with the rest period claims, plaintiffs' meal period
claims are not amenable to class treatment.

As already discussed, the critical inquiry on a class
certification motion is whether the theory of recovery
advanced by the certification proponents is likely to
prove amenable to class treatment (Sav-On, *supra*, 34
Cal.4th at p. 326), and, in order to determine whether
common questions of law or fact predominate, the trial
court must examine the issues framed by the pleadings
and the law applicable to the alleged causes of action
(Hicks, *supra*, 89 Cal.App.4th at p. 916).

As stated, *ante*, *section 512(a)* provides that an em-
ployer "may not employ an employee for a work period
of more than five hours per day without *providing* the

employee with a meal period of not less than 30 minutes" (italics added) and, if the employee's work period is less than six hours, "*the meal period may be waived*" (italics added).

**(12)** " 'To ascertain the common meaning of a word, "a court typically looks to dictionaries." ' " (*Arocho v. California Fair Plan Ins. Co. (2005) 134 Cal.App.4th 461, 466 [36 Cal. Rptr. 3d 200]*, fn. [*61] omitted.) The term "provide" is defined in Merriam-Webster's Collegiate Dictionary (11th ed. 2006) as "to supply or *make available*." (Italics added.) **(13)** Thus, from the plain language of *section 512(a)*, meal periods need only be made available, not ensured, as plaintiffs claim. Moreover, plaintiffs' interpretation of *section 512(a)* is inconsistent with the language allowing employees to waive their meal breaks for shifts of less than five hours.

In *White v. Starbucks Corp. (N.D.Cal. 2007) 497 F.Supp.2d 1080 (Starbucks)*, the United States District Court for the Northern District of California rejected the notion that employers must ensure their employees take meal breaks: "The interpretation that White advances--making employers ensurers of meal breaks--would be impossible to implement for significant sectors of the mercantile industry (and other industries) in which large employers may have hundreds or thousands of employees working multiple shifts. Accordingly, the court concludes that the California Supreme Court, if faced with this issue, would require only that an employer *offer* meal breaks, without forcing employers actively to ensure that workers are taking these breaks. [*62] In sum, the employee must show that he was *forced to forego* [*sic*] his meal breaks as opposed to merely showing that he did not take them regardless of the reason." (*Starbucks, supra, 497 F.Supp.2d at pp. 1088-1089.*)

More recently in *Brown, supra, 249 F.R.D. 580*, the United States District Court for the Central District of California considered a motion to certify a class of former and current Federal Express drivers who allegedly had been deprived of rest and meal periods in violation of *sections 512* and *226.7*. In analyzing the motion the district court first noted that " '[t]o determine whether common issues predominate, this Court must first examine the substantive issues raised by Plaintiffs and second inquire into the proof relevant to each issue.' [Citation.]" (*Brown, supra, 249 F.R.D. at p. 584.*)

As in this case, the plaintiffs in *Brown* asserted that "California law requires employers to ensure that meal breaks are actually taken." (*Brown, supra, 249 F.R.D. 584.*) The district court rejected this argument, holding that *section 512* and the applicable wage order did not support the plaintiff's position. (*Brown, supra, 249 F.R.D. 585*].) The court explained that *section 512's* statement that [*63] employer must "provide" meal periods "does not suggest any obligation to ensure that employees take advantage of what is made available to them." (*Brown, supra, 249 F.R.D. at p. 585.*) The court also noted that the California Supreme Court "in characterizing violations of California's meal period obligations ... repeatedly described it as an obligation not to force employees to work through breaks." (*Ibid.*, fn. omitted.) The court also noted that "[r]equiring enforcement of meal breaks would place an undue burden on employers whose employees are numerous ... . It would also create perverse incentives, encouraging employees to violate company meal break policy in order to receive extra compensation under California wage and hour laws." (*Id. at p. 585 *6.*)

We find the reasoning in *Starbucks* and *Brown* persuasive and conclude that employers need not ensure meal breaks are actually taken, but need only make them available.

Plaintiffs assert that *Cicairos, supra, 133 Cal.App.4th 949* and *Perez v. Safety-Kleen Systems (N.D.Cal. 2007) 2007 U.S. Dist. LEXIS 48308, 2007 WL 1848037 (Perez)* hold that meal breaks, unlike rest breaks, must be ensured, not merely made available. This contention is unavailing.

In *Cicairos, supra, 133 Cal.App.4th 949*, [*64] truck drivers brought an action against their former employer that included a claim for violation of *section 512* and an IWC wage order applicable to the transportation industry. The court in *Cicairos* held that, based on the facts presented there, the defendant's obligation to provide the plaintiffs with an adequate meal period was not satisfied "by assuming that the meal periods were taken." (*Cicairos, supra, 133 Cal.App.4th at p. 962.*) "[E]mployers have 'an affirmative obligation to ensure that workers are actually relieved of all duty.' " (*Ibid.*)

Plaintiffs assert this language means employers must "ensure" meal breaks are taken. The plaintiff in *Starbucks* made the same argument, and the Northern District rejected it, distinguishing *Cicairos* on its facts: "*Cicairos* should be read under the facts presented by that case. There, the defendant employer had a computerized system on each truck that allowed defendant to keep track of the drivers' activities, such as speed, starts and stops, and time. [Citation.] Furthermore, drivers had to input certain activities manually, such as road construction and heavy traffic. [Citation.] Although the defendant was required to record employee meal [*65] periods under Wage Order No 9 and although a collective bargaining agreement required the company to schedule lunch periods, the employer did not schedule meal periods, did not include an activity code for them and did not monitor compliance. [Citation.] Finally, evidence showed that the defendant's management pressured drivers to make more than one

trip daily, making it harder to stop for lunch. [Citation.] Under those facts, the court found that defendant failed to establish that it 'provided' plaintiffs with their required meal periods. [Citation.] White harps on one sentence in the case stating that 'employers have "an affirmative obligation to ensure that workers are actually relieved of all duty." ' [Citation.] That language is consistent, however, with a rule requiring an employer to *offer* or *provide* or *authorize and permit* a meal break, i.e., the interpretation that Starbucks endorses. The defendant in *Cicairos knew* that employees were driving while eating and did not take steps to address the situation. This, in combination with management policies, effectively deprived the drivers of their breaks." (*Starbucks, supra, 497 F.Supp.2d at p. 1089*; accord, *Brown, supra, 249 F.R.D. 585*.)

The [*66] court in *Starbucks* also rejected such an interpretation of *Cicairos* on policy grounds: "Under White's reading of *Cicairos,* an employer with no reason to suspect that employees were missing breaks would have to find a way to force employees to take breaks or would have to pay an additional hour of pay every time an employee voluntarily chose to forego [*sic*] a break. This suggests a situation in which a company punishes an employee who foregoes [*sic*] a break only to be punished itself by having to pay the employee. In effect, employees would be able to manipulate the process and manufacture claims by skipping breaks or taking breaks of fewer than 30 minutes, entitling them to compensation of one hour of pay for each violation. This cannot have been the intent of the California Legislature, and the court declines to find a rule that would create such perverse and incoherent incentives." (*Starbucks, supra, 497 F.Supp.2d at p. 1089*.)

*Perez* also does not support plaintiffs' position that meal breaks must be "ensured" as opposed to "made available." In *Perez, supra, 2007 WL 1848037 at *1,* the court denied a summary judgment motion brought by the employer as to employees' claim the employer [*67] had "fail[ed] to provide meal and rest breaks." In denying summary judgment on the meal break claim, the Northern District held there was an issue of fact as to whether the defendant "provided" (*id. at *6*) meal periods, given "the lack of a policy for meal breaks" (*id. at *7*), the fact plaintiffs "were on call at all times and were required to carry a company cell phone to maintain constant contact with the branch" (*id. at *6*) and that they "were required to complete a detailed log each day which specifically stated they were on duty from the time they arrived at the branch until going home at the end of the day." (*Ibid.*) Because there was evidence the employer had failed to *provide* meal periods, the court declined to decide whether employers also had the duty to ensure meal periods were taken: "[T]he court need not resolve plaintiffs' argument that California law 'does not permit an em-

ployee ... to decide to take a break or not take a break.' " (*Id. at *7*.) Relying on *Cicairos,* the court simply held "an employer must do something affirmative to *provide* a meal period ... ." (*Perez, supra, 2007 WL 1848037 at *7,* italics added.)

We also conclude *Cicairos* and *Perez* are distinguishable on their [*68] facts. In *Cicairos* and *Perez* the courts only decided meal breaks must be provided, not ensured. Indeed, as noted above, the court in *Perez* expressly declined to consider whether meal breaks need be ensured. We further agree with *Starbucks* that public policy does not support the notion that meal breaks must be ensured. If this were the case, employers would be forced to police their employees and force them to take meal breaks. With thousands of employees working multiple shifts, this would be an impossible task. If they were unable to do so, employers would have to pay an extra hour of pay any time an employee voluntarily chose not to take a meal period, or to take a shortened one.

### 3. Amenability of plaintiffs' meal break claims to class treatment

Further, we conclude, as we did with regard to rest breaks, that because meal breaks need only be made available, not ensured, individual issues predominate in this case and the meal break claim is not amenable class treatment. The reason meal breaks were not taken can only be decided on a case-by-case basis. It would need to be determined as to each employee whether a missed or shortened meal period was the result of an employee's personal [*69] choice, a manager's coercion, or, as plaintiffs argue, because the restaurants were so inadequately staffed that employees could not actually take permitted meal breaks. As we discussed, *ante,* with regard to rest breaks, plaintiffs' computer and statistical evidence submitted in support of their class certification motion was not only based upon faulty legal assumptions, it also could only show the fact that meal breaks were not taken, or were shortened, not why. It will require an individual inquiry as to all Brinker employees to determine if this was because Brinker failed to make them available, or employees chose not to take them.

In the recent case *Brown, supra, 249 F.R.D. 580,* once the district court concluded that meal periods need only be provided, not ensured, it also held that individual issues would predominate over common ones at a trial on the meal period claims and the motion to certify a class as to those claims was denied. (*Id. at 585*.) The district court held that use of time sheets was not a viable method of proving the meal break claims on a class-wide basis as they would not provide the "reason for missed breaks." (*Id. at 587*.) The court further held that class treatment [*70] was not a superior means of adjudicat-

ing the meal break claims because "[i]n order to prevail, each will have to demonstrate that he or she was not able to take breaks required by California law. [¶] Without a viable method of common proof for evaluating the ability of 5,500 class members to take breaks as required by law, the Court will be mired in over 5000 mini-trials regarding individual job duties and expectations. The difficulties in managing such a wide-ranging factual inquiry persuade the Court that class treatment is not a superior method for resolution of the class members' potential claims. Moreover, because class treatment here would nonetheless require individual class members to establish the reason for their missed breaks, class members would face many of the same difficulties in motivation and expenditure of resources that they would encounter in separate actions. In addition to this, they would face the inevitable delay imposed by waiting for the resolution of thousands of individual factual claims in the class action. Class treatment is not a superior means of adjudicating this controversy." (*Id.* at pp. 587-588.)

Likewise in our case, the evidence does not show that Brinker [*71] had a class-wide policy that prohibited meal breaks. The evidence in this case indicated that some employees took meal breaks and others did not. For those who did not, the reasons they declined to take a meal period requires individualized adjudication. Further, plaintiffs' statistical and survey evidence does not render the meal break claims one in which common issues predominate. While time cards might show when meal breaks were taken and when there were not, they cannot show *why*. Indeed, even plaintiffs' employee declarations show no class-wide practice regarding meal breaks. Some employees only claimed to have been refused rest breaks and said nothing about being denied meal breaks or that they were forced to take meal breaks at a certain time. As Brinkers' manager declarations also show, individual restaurants were given discretion to, and did, implement individualized practices to ensure compliance with meal break policies.

We also reject plaintiffs' claim the absence of written waivers signals that missed meal periods necessarily resulted from management coercion. There is no statutory requirement under *section 512(a)* that the "mutual consent" necessary to a waiver must be in [*72] writing. Had the Legislature intended such a requirement, they could have, and would have, placed such a requirement in the statute.

(14) Plaintiffs assert the affirmative defense of waiver cannot defeat class certification. This contention is unavailing as "a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over

common issues." (*Walsh v. IKON Office Solutions, Inc. (2007) 148 Cal.App.4th 1440, 1450 [56 Cal. Rptr. 3d 534].*)

Further, it matters not that Brinker bears the burden of proof on an affirmative defense. "The question before us ... is not whether [Brinker] proved its defense, but whether it presented evidence from which the trial court could reasonably conclude that the adjudication of the defense would turn more on individualized questions than on common questions." (*Walsh v. IKON Office Solutions, Inc., supra, 148 Cal.App.4th at p. 1453, fn. 8.*)

### D. *Off-the-clock Claims*

Brinker asserts the court erred by certifying plaintiffs' off-the-clock claims for class treatment "without identifying any common questions or common proof with respect to those claims or, for [*73] that matter, even mentioning them." Brinker asserts the resolution of plaintiffs' off-the-clock claims would require individual inquiries into whether a given employee actually performed off-the-clock work and whether the employee's manager had actual or constructive knowledge of such work. Citing the declarations of two class members (Jerry Gallon and Will Gordon) who stated that they often performed job duties while clocked out for meal periods or for the day, Brinker argues the declarations failed to indicate whether these employees were required to work off the clock or did so by their own choice, and also failed to indicate whether their supervisors knew they were performing off-the-clock work in violation of Brinker policy. Had the court examined the elements of plaintiffs' off-the-clock claims, Brinker asserts, the court "never could have certified them."

We conclude that, as with plaintiffs' rest and meal break claims, their off-the-clock claims are not amenable to class treatment because, once the elements of those claims are considered, individual issues predominate.

(15) Plaintiffs do not dispute that employers can only be held liable for off-the-clock claims if the employer knows [*74] or should have known the employee was working off the clock. (*Morillion v. Royal Packing Co., supra, 22 Cal.4th at p. 585.*) Nor do they dispute that Brinker has a written corporate policy prohibiting off-the-clock work.

Because of these facts, plaintiffs' off-the-clock claims are not amenable to class treatment. Plaintiffs propose to prove class-wide violations by Brinker by submitting declarations, statistical evidence and survey evidence showing the number of times employees worked during a meal period and the number of times changes were made to time cards. However, they do not submit evidence showing, on a class-wide basis, the reason *why* they worked off the clock. Indeed, as Brinker

points out, two employees that declared they "often performed job duties while clocked out for meal breaks or for the day" did not indicate whether they were required to do so or did so by their own choice, nor whether their supervisors had knowledge of such activities. Thus, resolution of these claims would require individual inquiries in to whether any employee actually worked off the clock, whether managers had actual or constructive knowledge of such work and whether managers coerced or encouraged [*75] such work. Indeed, not all the employee declarations alleged they were forced to work off the clock, demonstrating there was no class-wide policy forcing employees to do so.

Similarly, plaintiffs' claim that managers adjusted time cards, i.e., conducted "time-shaving," would also necessitate an individualized inquiry. As stated, *ante*, Brinker managers are authorized to adjust time cards if notified an employee's time was not accurately recorded. It would therefore have to be determined on an individual basis why a particular time card was adjusted and whether the justification given was legitimate.

Brinker "has the right to inquire into the validity of each claim with regard to the authority of the manager to instruct the employee to work off-the-clock, store management's knowledge of the employee's having performed work off-the-clock, whether the employee, in fact, performed any work off-the-clock, [and] the reason the employee did not submit a time adjustment request form." (*Wal-Mart Stores, Inc. v. Lopez (Tex.Ct.App. 2002) 93 S.W.3d 548, 558* [reversing class certification

of off-the-clock claim]; see also *Basco v. Wal-Mart Stores, Inc. (E.D.La. 2002) 216 F.Supp.2d 592, 603* [individual [*76] issues arising from the "myriad of possibilities that could be offered to explain why any one of the plaintiffs worked off-the-clock" would predominate over common issues]; *Petty v. Wal-Mart Stores, Inc. (Ohio Ct. App. 2002) 148 Ohio App. 3d 348 [2002 Ohio 1211, 773 N.E.2d 576, 582]* [finding issues were individual as to each plaintiff because of various circumstances under which employees worked off the clock and questions of management's knowledge of, and condoning, plaintiffs' working off the clock].) [10]

> 10    Although these out-of-state cases are not binding authority in California, we find their reasoning persuasive and consistent with our analysis of plaintiffs' off-the-clock claims.

Accordingly, we conclude the court erred in certifying as a class action plaintiffs' off-the clock claims.

DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its July 6, 2006 class certification order and enter a new order denying with prejudice certification of plaintiffs' rest, meal period, and off-the-clock subclasses. The stay issued on December 7, 2006, is vacated. Costs are awarded to Brinker.

Haller, J., and O'Rourke, J., concurred.

10795C

********** Print Completed **********

Time of Request: Wednesday, August 06, 2008  14:00:36 EST

Print Number:    1823:107169130
Number of Lines: 1133
Number of Pages:

Send To:   MUSANTE, ANTHONY
           SEYFARTH SHAW LLP
           400 CAPITOL MALL STE 2350
           SACRAMENTO, CA 95814-4428