# EXHIBIT B

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

VALERIE D. WATSON-SMITH, AND ALL )
OTHERS SIMILARLY SITUATED,       )
                                 )
                    Plaintiffs,  )
    vs.                          ) No. C07-05774
SPHERION PACIFIC WORKFORCE, LLC, )
and DOES 1 through 100,          )
inclusive,                       )
                                 )
                    Defendants.  )

Certified Copy

DEPOSITION OF VALERIE WATSON-SMITH

Thursday, August 14, 2008

REPORTED BY:

CD-ROM ENCLOSED

YVONNE FENNELLY, CSR NO. 5495

```
 1     A.    Five.
 2     Q.    Were there any other recruiters, Spherion
 3  recruiters in Building 5?
 4     A.    Yes.
 5     Q.    About how many when you went to work
 6  there?
 7     A.    Three or four.
 8     Q.    And do you know what building Tom worked
 9  in?
10     A.    Building 3.
11     Q.    Do you know how many recruiters, Spherion
12  recruiters there were in Building 3?
13     A.    No.
14     Q.    Was there more than just Tom?
15     A.    Yes.
16     Q.    Do you know how many -- this is when you
17  first went to work at Cisco -- do you know how many
18  Spherion recruiters there were onsite there at the
19  time?
20     A.    No.
21     Q.    Can you estimate for me?
22     A.    Yes.
23     Q.    How many would you say?
24     A.    15 to 25.
25     Q.    At the time you left, or were laid off at
```

1   Cisco, how many recruiters, Spherion recruiters,
2   were there at that time?
3       A.   I don't know.
4       Q.   Was it more than 15 to 25 or less than 15
5   to 25?
6       A.   Less.
7       Q.   And between the time you started at
8   Spherion and left -- I mean at Cisco and left --
9   did the number of Spherion recruiters onsite
10  increase?
11      A.   Can you repeat the question?
12      Q.   Sure.
13           You testified that there were about 15 to
14  25 Spherion recruiters onsite at Cisco when you
15  started working there and less than that when you
16  left.
17           My question would be, during the time in
18  between, did the number of recruiters increase or
19  stay about the same?
20      A.   It stayed about the same.
21      Q.   Now, as a recruiter at Spherion Cisco,
22  did you have assistants that worked for you?
23      A.   Can you ask the question again, please?
24      Q.   Sure.
25           Did you have assistants working for you

1  Q. Did Richard Cho know when you came to
2  work and when you left?
3  A. No.
4  Q. He didn't follow your schedule?
5  A. No.
6  MR. QUALLS: May I speak to you for a
7  moment?
8  (Recess taken.)
9  THE WITNESS: Can you repeat the
10 question?
11 (Record read.)
12 THE WITNESS: Correct; he did not
13 micromanage me like that, but he did know I was
14 working via e-mail exchange between him and I, and
15 also phone calls, voicemails before and after
16 hours, and weekends.
17 BY MR. SANDERSON:
18 Q. Most of your work was either done on the
19 computer or on the phone?
20 Let me ask you another way.
21 You had a computer that Cisco issued you;
22 right?
23 A. Correct.
24 Q. A laptop?
25 A. Yes.

1  and hiring a custodial person?
2       A.   Correct.
3       Q.   And your testimony was you don't know if
4  all of the Spherion Cisco recruiters were technical
5  recruiters?
6       A.   I don't know that.
7       Q.   Okay.
8            Did Richard Cho ever discuss your
9  schedule with you?
10           MR. QUALLS:  Objection; vague.
11  BY MR. SANDERSON:
12      Q.   Did he ever tell you that you needed to
13  come in at a certain time?
14      A.   No.
15      Q.   Did he ever tell you that you couldn't
16  take a break?
17      A.   No.
18      Q.   Did he ever tell you what time to leave
19  at the end of the day?
20      A.   No.
21      Q.   He never had any discussions with you
22  about those terms and conditions of your
23  employment?
24      A.   Correct.
25      Q.   Is it fair to say that you worked, as a

1    Q.   There are days when most of the day would
2    have been scheduled?
3    **A.   Correct.**
4    Q.   You understood that you could take time
5    to go get lunch; correct?
6         MR. QUALLS:  Objection; vague, lacks
7    foundation.  That's a vague question.
8    BY MR. SANDERSON:
9    Q.   Well, earlier you testified that you were
10   trying to find time to get a sandwich here or
11   there.
12   **A.   Correct.**
13   Q.   There were days you took a half an hour
14   lunch break; right?
15   **A.   No.**
16   Q.   Not in the entire time you were employed
17   there?
18        MR. QUALLS:  Objection; calls for a legal
19   conclusion.
20        You mean a half hour uninterrupted
21   off-duty lunch break; is that what you're
22   specifically asking her?
23        She's entitled to know what you mean by
24   that. The record should be clear about that.
25        MR. SANDERSON:  Well, it's plain English,

1   a 30-minute lunch break.  I'm not asking for a
2   legal conclusion.
3           MR. QUALLS:  All right, but that could
4   also be off duty.  I think that description of what
5   you're asking, I presume you're asking this witness
6   to respond to.
7           So he means a 30-minute off-duty lunch
8   break; that's what he means.
9           THE WITNESS:  No.
10  BY MR. SANDERSON:
11      Q.  So during -- strike that.
12          There was not one day during the entire
13  time you worked as a Spherion Cisco recruiter that
14  you met a friend for lunch for 30 minutes?
15      **A.  Very rarely.**
16      Q.  So it did happen?
17          MR. QUALLS:  Objection; vague.
18          He's asking you if that specific
19  30-minute off-duty lunch break ever happened.
20          THE WITNESS:  I don't understand.  I
21  don't understand what you're asking.
22  BY MR. SANDERSON:
23      Q.  Okay.
24          There are days you met friends for lunch;
25  right?

1   Q.   But the badge data would show that;
2   right?
3            MR. QUALLS:   Objection; calls for
4   speculation.
5            She's testified it doesn't show an exit
6   time.
7   BY MR. SANDERSON:
8   Q.   There were times you were working at home
9   when you were a Spherion Cisco recruiter when you
10  would do personal things during the day; right?
11  Nonbusiness-related?
12           MR. QUALLS:   Objection; vague.
13           You can answer.
14           THE WITNESS:  Yes.
15  BY MR. SANDERSON:
16  Q.   For example, there would be times during
17  the day when you would shop on the internet; right?
18           MR. QUALLS:   Objection; vague.
19           THE WITNESS:  No.
20  BY MR. SANDERSON:
21  Q.   Did Richard Cho ever tell you that you
22  couldn't take a lunch break?
23  **A.   No.**
24  Q.   Did Jenny Dede ever tell you that you
25  couldn't take a lunch break?

```
 1     A.    No.
 2     Q.    Did anybody at Spherion ever tell you
 3  that you were not entitled to take a lunch break?
 4     A.    No.
 5     Q.    Do you have a home office set up?
 6     A.    Yes.
 7     Q.    So you had a place specifically for you
 8  to work, do Spherion work?
 9     A.    Yes.
10     Q.    Did you have kids at home at that time?
11           That lacks foundation.
12           Let me ask the question I should have
13  asked before that.
14           Do you have children?
15     A.    Yes.
16     Q.    How old are they?
17     A.    She's 21.
18     Q.    One daughter?
19     A.    One daughter.
20     Q.    So during the time that you were a
21  Spherion Cisco recruiter, she would have been about
22  19?
23     A.    Yes.
24     Q.    Was she living at home?
25     A.    She was away at college.
```

1   aren't mutually exclusive.
2           You can answer.
3           MR. SANDERSON:  I'm just using her
4   language.
5           MR. QUALLS:  You can answer.
6           THE WITNESS:  We all said it in passing.
7   It was a standing joke.
8   BY MR. SANDERSON:
9       Q.  Did Mr. Cho say anything in response to
10  your comment?
11      **A.  He would laugh.**
12      Q.  Did you ever tell Richard Cho that I need
13  a 30-minute meal period every day?
14      **A.  No.**
15      Q.  Switching to Kaiser now, as a Kaiser
16  recruiter, did you take your meal periods?
17          MR. QUALLS:  Objection; lacks foundation,
18  vague.
19          You can answer.
20          THE WITNESS:  At one point.
21  BY MR. SANDERSON:
22      Q.  At what point did you take meal periods
23  when you were a recruiter at Kaiser?
24      **A.  When a Spherion person from the San Ramon
25  office called me and eventually told me I need to**

1   take lunch.
2       Q.   Was it the case that you were not
3   recording your meal period on your time sheet and
4   the person at the branch noticed you were not
5   recording it and told you you needed to take it, is
6   that how it happened?
7            MR. QUALLS:   Objection; vague.
8            Could you read back the question, Madam
9   Court Reporter?
10           (Record read.)
11           MR. SANDERSON:   I'll break it down.
12  BY MR. SANDERSON:
13      Q.   Did you -- on the manual time sheets you
14  completed at Kaiser, when you were a recruiter at
15  Kaiser, did you record meal periods?
16      A.   **When she told me.**
17      Q.   Okay.
18           Prior to the time she told you to record
19  meal periods, you had not been recording meal
20  periods?
21      A.   **She told me to take lunch.**
22      Q.   Prior to the time she told you to take
23  lunch you had not been recording meal periods on
24  your time sheet?
25           MR. QUALLS:   Objection; vague.

1           Are you asking her was she not recording
2  meal periods that she, in fact, was taking; is that
3  what you're asking?
4           MR. SANDERSON:  No, no.
5           I'll start over.
6  BY MR. SANDERSON:
7       Q.  As a recruiter at Kaiser, eventually you
8  were told to record your meal periods; is that
9  correct?
10      **A.  Yes.**
11      Q.  And after you were told to record your
12 meal period, did you begin to take meal periods?
13      **A.  Yes.**
14      Q.  Prior to the time you were told to record
15 your meal period, did you take meal periods?
16      **A.  No.**
17      Q.  Do you know why the Spherion branch
18 person told you to begin recording your meal
19 periods?
20          MR. QUALLS:  Do you know why she called
21 you?
22          THE WITNESS:  No.
23 BY MR. SANDERSON:
24      Q.  She just -- what did she tell you when
25 she called you?

1   A.   She asked me was I taking lunch?
2   Lunches?
3   Q.   What did you say?
4   A.   I told her no.
5   Q.   And what did she say?
6   A.   She said, you need to take lunch.
7   Q.   Was she more specific than that?
8   A.   She may have been.  You know, she's
9   saying I need to take lunch and I need to put it
10  down.  You know, they wanted to make sure --
11       MR. QUALLS:  Don't say what they wanted
12  you to do unless they told you what they wanted to
13  do.
14  BY MR. SANDERSON:
15  Q.   Okay, but she told you, number one, that
16  you had to take lunch, and, number two, that you
17  needed to put it down on your time sheet; right?
18  A.   Yes.
19  Q.   Just real quick, you claim that you have
20  unreimbursed expenses in your employment as a Cisco
21  recruiter?
22  A.   Claim?
23  Q.   Well, part of your complaint is a claim,
24  a request for reimbursement for expenses, and I
25  just want to go through what those expenses were.